Michael Delikat
James H. McQuade
Mayotta H. Anderson
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
(212) 506-5000

Attorneys for Wyeth Pharmaceuticals, Inc.,
Walter Wardrop, and Robert Bracco

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAISY EARLY,<br><br>               Plaintiff,<br><br>          v.<br><br>WYETH PHARMACEUTICALS, INC.,<br>WALTER WARDROP and<br>ROBERT BRACCO,<br><br>               Defendants. | 07-CV-947 (WCC) (LMS)<br><br>**DEFENDANTS' RULE 56.1 STATEMENT** |

Defendants Wyeth Pharmaceuticals, Inc., ("Wyeth"), Walter Wardrop, and Robert Bracco (together, "Defendants"), by their attorneys, Orrick, Herrington & Sutcliffe LLP, as and for their statement of material facts as to which there is no genuine issue to be tried, state as follows:

**Background: Wyeth**

1.     Wyeth is a company engaged in the development and manufacture of pharmaceutical consumer healthcare, and animal health products. Declaration of Joanne Rose ("Rose Decl."), ¶ 2. Wyeth operates pharmaceutical manufacturing facilities in numerous locations, including in Pearl River, New York. Rose Decl., ¶ 3.

2.     Wyeth is organized into several separate business organizations and units. Wyeth's Consumer Health Division at the Pearl River facility is responsible for, among other things, manufacturing healthcare products such as vitamins and nutritional supplements. Rose Decl., ¶ 4. Over the years, the Consumer Health Division at the Pearl River facility has been divided into a number of different manufacturing areas or units, referred to at various times as "trains" or "primary production units." Rose Decl., ¶ 4.

3.     The pharmaceutical operators, who work directly on the various manufacturing lines within the Consumer Health Division, are union employees and their employment is governed by the terms of the contract between Wyeth and the International Chemical Workers Union, Local 148 (the "Union Contract"). Rose Decl., ¶ 5; McQuade Decl. Ex. 1, at 30-31, & Ex. 4.

4.     Pharmaceutical operators report to supervisors, who, in turn, report to other non-union managers within the Consumer Health Division. McQuade Decl. Ex. 1, at 39-41.

**Plaintiff Daisy Early**

5.     In October 1976, Early was hired to work as an inspector on the night shift in Wyeth's Consumer Health Division. McQuade Decl. Ex. 1, at 21-23.

6.     During the time Early was an inspector from 1976 through 1982, Early estimates that she had approximately a dozen different supervisors, as there was constant turnover among supervisors in her area. McQuade Decl. Ex. 1, at 25. Early cannot recall precisely who her supervisors were during this time. McQuade Decl. Ex. 1, at 26-27.

7.     In 1982, Early became a pharmaceutical operator in Wyeth's Consumer Health Division, and continued in that position until she left Wyeth in 2005. McQuade Decl. Ex. 1, at 24, 27.

8.     During her time as a pharmaceutical operator, Early reported to numerous different supervisors. Of the ten supervisors Early could recall having when she worked as a pharmaceutical operator, five of them were African-American. McQuade Decl. Ex. 1, at 39-41.

**Defendant Walter Wardrop**

9.     From 1997 through May 2000, Wardrop worked as a production supervisor in the Consumer Health Division. McQuade Decl. Ex. 3, at 14. During this time period, Wardrop worked on a different shift than Early, and therefore, was not her direct supervisor. McQuade Decl. Ex. 3, at 14.

10.    The only time during Early's employment at Wyeth that Wardrop possibly could have directly supervised Early was on those select occasions when she worked overtime on the shift he supervised during the time period from 1997 through May 2000. McQuade Decl. Ex. 3, at 14-15.

**Defendant Robert Bracco**

11.    Bracco worked as a Department Head and/or an Associate Director in the Consumer Health Division from June 1999 to November 2003. In December 2003, Bracco moved out of the Consumer Health Division, where Early worked. McQuade Decl. Ex. 1, at 261.

12.    Bracco never directly supervised Early during her employment. McQuade Decl. Ex. 2, at 35-36.

**The Union Contract**

13.    Early understood when she began working at Wyeth that her employment would be governed by the Union Contract. McQuade Decl. Ex. 1, at 30-31, & Ex. 4.

14.    Early has read and is familiar with the Union Contract.  McQuade Decl. Ex. 1, at 29, 34, 36.

15.    Article 7.1 of the Union Contract outlines a formal written grievance procedure for employees.  McQuade Decl. Ex. 1, at 30-31, & Ex. 4.

16.    Article 7.2 of the Union Contract states that an employee has the right to have a grievance adjusted without the intervention of a union representative.  McQuade Decl. Ex. 1, at 30-31, & Ex. 4.

17.    Early never asked the union to file a formal grievance on her behalf.  McQuade Decl. Ex. 1, at 32, 35.

**Early's August 1989 Suspension for Swearing at Her Supervisor and Walking off the Job**

18.    In August 1989, Early was suspended from work for 10 days and placed on probation for one year for angrily shouting at her supervisor, Raymond Kelly, to "get the hell out of [her] face" and for leaving her work area.  McQuade Decl. Ex. 1, at 68-70, & Ex. 8.

19.    Early was suspended on this occasion in August 1989 after having a full hearing with a union representation.  McQuade Decl. Ex. 1, at 74.

20.    Early never told anyone at Wyeth that she felt that her discipline was discriminatory in nature.  McQuade Decl. Ex. 1, at 75.

21.    Early claims that she received more severe discipline than another employee, who was white, on this occasion because of her race, but Early admits that she does not know if the other employee had left the work area and had used foul language with a supervisor like she had.  McQuade Decl. Ex. 1, at 73-76.

**Early's November 1990 Written Warning for an**
**Admitted Violation of Manufacturing Procedures**

22.    Early admits that, on November 2, 1990, she failed to follow established

procedures in the manufacturing process. McQuade Decl. Ex. 1, at 76-78, & Ex. 9. Early admits

that this was an incident of poor performance and that she had made an error. McQuade Decl.

Ex. 1, at 78, 81.

23.    Early's then supervisor, Butch Babcock, issued her a written interview record for

this incident. McQuade Decl. Ex. 1, at 78. Early admits that everything in the written interview

record was accurate, that she was represented by the union in connection with this incident, and

that the union signed off on this written warning. McQuade Decl. Ex. 1, at 78-79.

24.    Early signed the interview record without providing any written statement in the

space provided. McQuade Decl. Ex. 1, & Ex. 9.

25.    Early admits that, when she signs a document, it is an expression of her agreement

with the contents of the document and that, if she disagrees with the contents of a document, she

writes her comments on the document. McQuade Decl. Ex. 1, at 58-59.

26.    Early admits that her only basis for believing that she was discriminated against

based on her race with respect to this incident is her suspicion that another employee involved

with making the product (Jim Tanner) was not written up. McQuade Decl. Ex. 1, at 78-79, 82.

27.    Early, however, admits that she (unlike Jim Tanner) was responsible for signing

the batch record for that product, certifying that the product had been made properly. Early

admits that, by signing the batch record, she ultimately was responsible for any errors with

respect to the product. McQuade Decl. Ex. 1, at 81.

28.    Early admits that Jim Tanner performed different tasks in making the product, and

admits that she does not know whether Tanner actually was written up for this incident:

Q:    So you have no way of knowing whether he's been written up or not?

A:    No, sir, in all honest[y], I have no way of knowing that he wasn't written up.

McQuade Decl. Ex. 1, at 79.

29.    Early concedes that she never complained to anyone at Wyeth that she was being treated unfairly based on her race with respect to this incident. McQuade Decl. Ex. 1, at 80.

30.    Early's employment was not impacted in any way and she did not suffer any adverse consequences as a result of this interview record. McQuade Decl. Ex. 1, at 134-35, 256.

**Early's September 1994 Suspension for Sleeping on the Job**

31.    In September 1994, following a hearing with union representation, Early was suspended for three days after two security guards claimed they observed her sleeping at work. McQuade Decl. Ex. 1, at 94-106, & Ex. 12.

32.    Early claims that two unnamed security guards were responsible for suspending her on this occasion. McQuade Decl. Ex. 1, at 96.

33.    According to Early, the head of her department at that time, Judy Sperr, defended her, opposed the suspension, and helped her get the suspension lifted. McQuade Decl. Ex. 1, at 96.

34.    Early admits that her only basis for believing that her suspension for sleeping on the job in 1994 was discriminatory is that she claims that she observed three white employees sleeping on some unspecified occasion more than six years later during the time period 2000 through 2005, and one other employee sleeping on one unspecified occasion in 1994. McQuade Decl. Ex. 1, at 97-107. These employees did not report to Judy Sperr.

35.    At her deposition, Early ultimately conceded that she did not feel as if she had been discriminated against with respect to this incident in 1994:

Q:     Other than your belief that there were others sleeping on the job during this time period, do you have any reason – do you have any basis for believing that you were discriminated against with respect to this suspension?

A:     No, sir.  I don't think I was discriminated with.  As I told you, my department head fought for me.  I don't think she discriminated against me.  I think she did her job.

Q:     So you don't think you were discriminated against in any way with respect to this.

MR. TILTON: Objection.  That's not what she said.

A:     In 1994, no, I did not feel discriminated against.

McQuade Decl. Ex. 1, at 107.

**Early's May 2000 Verbal Attack of Her Supervisor**

36.     In May 2000, Early verbally attacked and cursed at her supervisor, Renardz Sylvain, who is African-American.  McQuade Decl. Ex. 1, at 116-20, & Ex. 16.

37.     According to Early, another of her supervisors, Todd Davenport, who is African-American, issued her a written interview record for this incident.  McQuade Decl. Ex. 1, at 40, 128.

38.     In a statement Early wrote on the interview record, Early confessed that she did "lose it" in verbally attacking her supervisor, she "understood that [she has] a problem," and she apologized to her department and to Bracco, her department head, because they had "had several conversations and [she felt] that [she had] put forth an effort to stay calm and to come and talk with him."  McQuade Decl. Ex. 1, at 116-21, & Ex. 16.

39.     Early was represented by the union in connection with this written warning and the issuance of the written warning was "agreed to by [the] parties."  McQuade Decl. Ex. 1, at 116, & Ex. 16.

40.     Early's only basis for believing that she was issued a written warning for this incident because of her race is her own "opinion" that Bracco instructed Davenport to issue the written warning to her because of her race. McQuade Decl. Ex. 1, at 120-26.

41.     However, Early has no firsthand knowledge that Bracco instructed Davenport to write her up on this occasion, and Early admitted that she thought Bracco treated her fairly in or around the time of this incident. McQuade Decl. Ex. 1, at 120-24.

42.     Early's employment was not impacted in any way and she did not suffer any adverse consequences as a result of this interview record. McQuade Decl. Ex. 1, at 134-35, 256.

**Early's October 2000 Verbal Counseling For Failing to Follow SOPs**

43.     In October 200, Early failed to follow standard operating procedures ("SOPs") in the production process, and her supervisor, Todd Davenport, issued a verbal counseling to Early for this incident. McQuade Decl. Ex. 1, at 126-28, & Ex. 17.

44.     Early signed the verbal counseling document without providing any statement on the document. McQuade Decl. Ex. 1, & Ex. 17.

45.     Early admits that she does not know whether Bracco was involved with issuing this warning. McQuade Decl. Ex. 1, at 129.

46.     Early's employment was not impacted in any way and she did not suffer any adverse consequences as a result of this verbal counseling. McQuade Decl. Ex. 1, at 134-35, 255-56.

**Early's March 2001 Request for Overtime Shift Change on One Saturday**

47.     During a short period of time in March 2001, all pharmaceutical operators were required to work overtime on Saturdays.   McQuade Decl. Ex. 1, at 135, & Ex. 18.

Pharmaceutical operators were required to work overtime on Saturdays on the same shift that they worked regularly during the week. McQuade Decl. Ex. 1, at 139.

48.     Under Wyeth policy, which applied to all employees, Early was required to work the day shift for weekend overtime because that was the shift to which she was assigned during the week. McQuade Decl. Ex. 1, at 137-39.

49.     Shortly after the mandatory Saturday overtime was initiated in March 2001, Early requested a change in the overtime shift she worked on one Saturday, from Train 1, the day shift, to Train 2, the night shift. McQuade Decl. Ex. 1, at 135-39.

50.     In her written request for a shift change, Early wrote that she needed the change because she had "three children in [her] care and that [she] must transport to various activities on Saturday beginning at 9:30 and ending at 5:30 p.m." McQuade Decl. Ex. 1, at 147, & Ex. 18. Early also wrote in her shift change request that the participation of her grandchildren in these "various activities" she described as the basis for her request was "mandated by the state." McQuade Decl. Ex. 1, at 137, 146-47, & Ex. 18.

51.     At her deposition, Early testified that attendance at her granddaughter's basketball games was the only reason she requested the shift change and that attending her granddaughter's basketball games was not mandated by the state. McQuade Decl. Ex. 1, at 136-37, 146-47, & Ex. 18.

52.     Early made this request for a shift change directly to Bracco, and Bracco granted her request, allowing her to work overtime on that Saturday on the shift of her choice, even though such a request was a deviation from the established practice that applied to all employees. McQuade Decl. Ex. 1, at 137-38, 141-42.

53.     Early acknowledged that by approving her request for a shift change for weekend overtime, Bracco granted her an accommodation, and Bracco did not discriminate against her in any way by granting her this accommodation. McQuade Decl. Ex. 1, at 137-42, 143-44.

54.     When Early worked overtime on Saturday on the night shift per her request, she was supervised by Renardz Sylvain, an African-American supervisor. McQuade Decl. Ex. 1, at 142-45.

55.     After supervising Early that Saturday on the night shift, Sylvain complained to Bracco that his experience working with Early had not gone well and that he did not want to work with her again in the future. McQuade Decl. Ex. 1, at 120, & Ex. 2, at 46.

56.     Early requested a shift change to the night shift for overtime on the following Saturday in March 2001, and her request on this second occasion was denied. McQuade Decl. Ex. 1, at 144-46, 150-51; McQuade Decl. Ex. 2, at 47-48.

57.     Early claims that she called Jerry Gass, a union shop steward, on the day she learned that her request was denied. McQuade Decl. Ex. 1, at 141, 150-51, 153. Early did not tell Gass that she believed she was being treated unfairly because of her race in connection with the denial of her second request for a shift change. McQuade Decl. Ex. 1, at 153-54.

58.     Early claims that she also contacted union representative Jeff Gathers, who is an African-American, and that she and Gathers then went to Bracco's office to complain about the denial of her request for a shift change. McQuade Decl. Ex. 1, at 153-55, and Ex. 1, ¶ 31.

59.     Early claims that Bracco told her that the denial of her request to change her shift on that one particular day had been denied because she was performing poorly and had harassed Sylvain during the last weekend shift they worked together. McQuade Decl. Ex. 1, at 141, 150-51.

60.     Early claims that she told Bracco during this conversation that she believed that she had been discriminated against with respect to the denial of her request to change shifts on this one day and that it was unfair that Sue Tomkins had been granted shift changes to sunbathe. McQuade Decl. Ex. 1, at 155-56.

61.     Early claims that she never made any complaint about discrimination during her employment at Wyeth. McQuade Decl. Ex. 1, at 208.

62.     Bracco denies that Early ever raised the issue of race or discrimination with him at any time. McQuade Decl. Ex. 2, at 9, 42, 49.

**June 2001 Alleged Comment Regarding Voodoo**

63.     Bracco left work on a medical leave of absence from May 21, 2001 to June 25, 2001. McQuade Decl. Ex. 1, at 161.

64.     Early claims that a co-worker told her that, when Bracco returned from medical leave in June 2001, Bracco had said that Early had tried to put voodoo on him. Early characterized this as "rumors." McQuade Decl. Ex. 1, at 161-63.

65.     Early admits that she has no firsthand knowledge of Bracco making any such statements about voodoo. McQuade Decl. Ex. 1, at 162; McQuade Decl. Ex. 2, at 57. Early testified:

Q:     But you didn't hear Bob Bracco make these statements yourself.

A:     Absolutely not, no, sir.

McQuade Decl. Ex. 1, at 162.

66.     Bracco denies ever using the word "voodoo" in the workplace and denies making these statements. McQuade Decl. Ex. 2, at 57-60.

67.     Early also claims, at about this same time, she was "approached by Walter Wardrop [at] 6:00 in the morning and asked what [she] was doing sticking pins in a doll, what have I ever done to you." McQuade Decl. Ex. 1, at 162, 165, 245.

68.     Wardrop denies ever making this statement to Early. McQuade Decl. Ex. 3, at 37-38.

69.     Early claims she told Jeff Gathers about Bracco's alleged comment, but did not ask Gathers to file a grievance on her behalf. McQuade Decl. Ex. 1, at 168-69.

70.     Early admits that she did not complain to anyone in the Human Resources or Labor Relations department about Bracco's or Wardrop's alleged comments. McQuade Decl. Ex. 1, at 169, 171.

71.     Early admits that she understood that she could have complained to the Human Resources or Labor Relations department at Wyeth about these alleged comments. McQuade Decl. Ex. 1, at 171-73.

**Early's September 2002 Argument with Supervisor Ken Flowers**

72.     According to Early, in September 2002, Ken Flowers, a supervisor, accused her of failing to clean up tablets under a machine. McQuade Decl. Ex. 1, at 192-94, 196.

73.     Early claims she responded by telling Flowers in a raised voice that "the room was clean and it was one of the cleanest rooms he ever had." McQuade Decl. Ex. 1, at 196-97. Early testified that she often has a "hard time keeping [her] voice down." McQuade Decl. Ex. 1, at 197-98.

74.     According to Early, after the incident, she discussed it with Flowers, and Flowers apologized and asked if they could start over. McQuade Decl. Ex. 1, at 194, 200.

75.     Early admits that she was not disciplined for the incident with Flowers and that this incident did not affect her employment in any way.  McQuade Decl. Ex. 1, at 200.

76.     Apart from her belief that she was being "targeted" by Bracco, Early admits that she has no basis for believing that she was discriminated or retaliated against because of her race in connection with this incident with Flowers.  McQuade Decl. Ex. 1, at 199-200, 202.

77.     Early testified that she did not "have a clue" as to whether Flowers or anybody else harbored racial animus toward her.  McQuade Decl. Ex. 1, at 202.

**Early's Work Assignments**

78.     Early claims that, from 2000 through 2005, she was assigned to work with pan coaters by herself and was assigned to work in the compression area by herself and she felt that this was unfair.  McQuade Decl. Ex. 1, at 203.

79.     Early admits that running pan coaters and working in the compression area was a part of her job responsibilities.  McQuade Decl. Ex. 1, at 204.

80.     Early admits that other pharmaceutical operators were assigned to work with the pan coaters and compression as well, but asserts that she was assigned to these areas "more frequently than any other employee."  McQuade Decl. Ex. 1, at 204.

81.     Early was unable to identify by name any of the employees whom she believed were not assigned to pan counters and compression as much as she was.  McQuade Decl. Ex. 1, 205.

82.     Early does not know which supervisors assigned her to run the pan coaters and compression during this time period.  McQuade Decl. Ex. 1, at 204, 206.

83.     Early admitted that she never complained to her supervisors about race discrimination in connection with job assignments.  McQuade Decl. Ex. 1, at 206-09.

84.    At her deposition, Early essentially conceded that she has no basis for believing that her assignment to pan coaters and compression was either discriminatory based on her race or retaliatory based on a complaint of race discrimination.  McQuade Decl. Ex. 1, at 207-209. Early testified as follows:

> Q:    So you have no reason to believe that the individual supervisors who were making these decisions had any discriminatory animus against you?

> A:    I have no idea what someone felt against me because of my race.  All I know is the supervisor does what a department head allows him to do.  Now, if it was my race, the color of my eyes, the sound of my voice, I don't know.  I just know that I felt targeted.

McQuade Decl. Ex. 1, at 209-10.

**Supervisor Greg Dubler Allegedly Asks Early on One Occasion**
**on Some Unidentified Date What She Has In Her Pockets**

85.    Early testified that Greg Dubler, a supervisor, asked her on one occasion what she had in her pockets.  McQuade Decl. Ex. 1, at 210-11, & Ex. 1, ¶ 48(c).

86.    In response to his inquiry, Early claims she told Dubler that she did not have to give him what was in her pockets and "that was the end of it."  McQuade Decl. Ex. 1, at 211.

87.    Early cannot recall when Dubler asked her what she had in her pockets. McQuade Decl. Ex. 1, at 211.

88.    Early admits that foreign medications are not permitted on the sterile production floor at Wyeth, and that it is not uncommon for supervisors to ask employees if they had things in their pockets.  McQuade Decl. Ex. 1, at 212.

89.    Early claims that other African-American employees told her that Dubler also had asked them what was in their pockets on various occasions.  McQuade Decl. Ex. 1, at 212-13.

90.    Early does not know if Dubler asked any white employees what they had in their pockets on occasion.  McQuade Decl. Ex. 1, at 213.

91.     Early admitted that no adverse action was taken against her as a result of her refusing to give Dubler what was inside her pockets.  McQuade Decl. Ex. 1, at 212.

92.     Early did not file a grievance with the union based on this incident with Dubler. McQuade Decl. Ex. 1, at 213.

93.     Early admits that her only basis for believing that Dubler treated her unfairly because of her race with respect to this incident is that some African-American colleagues told her that Dubler had asked them what was in their pockets, and that Early herself had not witnessed Dubler ask a white employee this same question.  McQuade Decl. Ex. 1, at 214-15.

**At Some Unidentified Time, Dubler Allegedly Told Early That She Could Be Suspended for Repeated Failures to Follow SOPs**

94.     Early claims that, at some unspecified time, Dubler told her she could be suspended for repeated failures to follow SOPs, which she refers to as "paperwork errors." McQuade Decl. Ex. 1, at 215-17.

95.     Early claims Dubler made this statement to her on only one occasion, but she does not know when Dubler made this statement to her.  McQuade Decl. Ex. 1, at 216-17.

96.     Early does not dispute that she actually made the paperwork errors, and she admits that no action was ever taken against her for these errors.  McQuade Decl. Ex. 1, at 218.

**Dubler's Supervision of Early**

97.     Early claims that, on four occasions, Dubler hid behind machines and scrutinized her work looking for something wrong with it.  McQuade Decl. Ex. 1, at 219-20.

98.     Early could not recall the exact time period during which this alleged conduct occurred.  McQuade Decl. Ex. 1, at 220-21.

99.    Apart from one other employee, Early does not know whether Dubler scrutinized the work of other pharmaceutical operators in the same way he scrutinized her work. McQuade Decl. Ex. 1, at 223.

100.    Early admits that she does not know whether Dubler treated her differently because of her race. McQuade Decl. Ex. 1, at 223.

101.    Early testified that on three to four occasions while Dubler was her supervisor, Dubler told her she could not leave until another employee asked her to "keep her machine running while everyone else had cleaned up . . . because there was going to be a meeting or something." McQuade Decl. Ex. 1, at 225. According to Early, on these three or four occasions, Early was the only pharmaceutical operator required to continue working, and all other pharmaceutical operators under his supervision, regardless of race, were permitted to leave. McQuade Decl. Ex. 1, at 227.

**Incorrect Overtime Charges on Three Days in 2005**

102.    In or around late February 2005, Early complained to Wardrop, the department head at the time, that Jose Torres had made an improper overtime charge to her in connection with an approved emergency vacation day that she had taken on February 21, 2005 due to inclement weather. McQuade Decl. Ex. 1, at 228-32; Wardrop Decl., ¶ 5, & Ex. 2.

103.    Torres was Early's supervisor only when she worked overtime on a different shift. McQuade Decl. Ex. 1, at 229.

104.    In response to Early's complaint about improper overtime charges by Torres, Wardrop contacted Torres and learned that Torres had charged Early for her absence on February 21, 2005 as if it were an unauthorized absence when it had indeed been authorized by Hallock. Wardrop Decl., ¶ 6.

105.   Wardrop told Torres to correct the incorrect overtime charge, and Wardrop believed the issue had been resolved.  Wardrop Decl., ¶ 6.

106.   Wardrop did not realize until Early contacted him again in or around mid-late April or May 2005 that Torres had not followed his directive to correct the error and that Torres had made other improper time charges to Early on two other days.  Wardrop Decl., ¶ 8, & Ex. 2.

107.   After Early told Wardrop that her overtime charges still had not been corrected, Wardrop told Torres again to correct them.  Wardrop Decl., ¶ 9.

108.   In or around May 5, 2005, Early told Wardrop that her overtime charges had not been corrected and told Wardrop, for the first time, that she believed Torres' actions were discriminatory. Wardrop Decl., ¶ 10.

109.   Pursuant to Wyeth policy, upon receiving Early's complaint of discrimination Wardrop contacted representatives of Wyeth's Labor Relations and Human Resources departments, to initiate an investigation.  Wardrop Decl., ¶ 11; Declaration of Stacey Marroso ("Marroso Decl."), ¶¶ 3-5; Rose Decl., ¶¶ 18-19; McQuade Decl. Ex. 3, at 11-12, 23-24.

110.   After Wardrop reported Early's complaint to Labor Relations and Human Resources, Marroso launched an investigation.  Marroso Decl., ¶ 4; McQuade Decl. Ex. 3, at 23-24, 27-29.

111.   As a part of the investigation into Early's complaint of discrimination, representatives of the Labor Relations and Human Resources departments met with Early. Marroso Decl., ¶ 6; McQuade Decl. Ex. 1, at 233-34.

112.   Marroso and Randby also interviewed supervisor Jennifer Hallock on May 18, 2005, supervisor Jose Torres on May 19, 2005, supervisor Vonda Hill on May 20, 2005, and supervisor Manny Rivera on May 26, 2005, regarding Early's complaint.  Marroso Decl., ¶ 6.

113.    At the conclusion of the investigation into Early's complaint, Marroso informed Wardrop of the findings of the investigation. Wardrop Decl., ¶¶ 14-15; Marroso Decl., ¶ 11.

114.    The investigation found no evidence that Torres had discriminated against Early based on her race. Wardrop Decl., ¶ 14; Marroso Decl., ¶ 9; McQuade Decl. Ex. 3, at 35.

115.    The investigation did reveal that Torres had committed several violations of Wyeth policy and its rules regarding personal and general conduct. Wardrop Decl., ¶ 15; Marroso Decl., ¶ 10; McQuade Decl. Ex. 3, at 35-36.    In particular, Torres had been insubordinate to Wardrop by not following his instruction on at least two occasions to correct the incorrect overtime charges that Torres had made to Early. Wardrop Decl., ¶ 15; Marroso Decl., ¶ 10.  Torres had also left the production area unsupervised for prolonged periods by taking excessively long breaks during the shifts he worked. Wardrop Decl., ¶ 15; Marroso Decl., ¶ 10. Torres' improper cancellation of a shift on one occasion had resulted in lost production time and revenue for Wyeth. Wardrop Decl., ¶ 15; Marroso Decl., ¶ 10. The investigation further showed that Torres used profanity many times in the workplace and had used a Wyeth telephone card to make unauthorized, personal calls. Wardrop Decl., ¶ 15; Marroso Decl., ¶ 10.

116.    Marosso found that some of the work assignments Torres gave Early and the improper overtime charges he made to her were vindictive in nature. Wardrop Decl., ¶ 15; Marroso Decl., ¶ 10; McQuade Decl. Ex. 3, at 35-36. Specifically, Marosso found that Torres acted in a vindictive manner toward Early because she had complained about incorrect overtime to the union. Wardrop Decl., ¶ 15.

117.    Based on the results of the Human Resources investigation, Wardrop decided to suspend and then terminate Torres' employment. Wardrop Decl., ¶ 16; McQuade Decl. Ex. 3, at 9-10.

118.    On June 3, 2005, Wardrop terminated Torres' employment.  Wardrop Decl., ¶ 18;
Marroso Decl., ¶ 14; Rose Decl., ¶ 19.

119.    Wardrop contacted Early to inform her that based on the results of the
investigation into her complaint, he had decided to terminate Torres' employment.  McQuade
Decl. Ex. 1, at 234; Wardrop Decl., ¶ 19.

120.    Early admits that the 32 hours of improperly charged time was corrected.
McQuade Decl. Ex. 1, at 234-35.

**<u>Voluntary Termination and Severance Package</u>**

121.    In a memorandum dated July 7, 2005 (the "July 7th memorandum"), Wyeth
offered a voluntary termination and severance package to eligible employees.  McQuade Decl.
Ex. 1, at 252, 258, & Ex. 23.

122.    Early was eligible for this voluntary termination and severance package.
McQuade Decl. Ex. 1, at 252.

123.    On August 17, 2005, Early signed an acknowledgement attached to a
memorandum from James Rowan, accepting the voluntary termination and transition benefit
package from Wyeth.  McQuade Decl. Ex. 1, at 256-57, & Ex. 24.

124.    The acknowledgment form that Early signed stated, "I acknowledge that I have
read the memorandum of agreement dated July 27th, 2005 and the addendum to this
memorandum of agreement dated August 9th, 2005, understand them and voluntarily enter into it
without coercion and with the knowledge of the nature and consequences thereof.  I accept the
opportunity to volunteer for release in a transition and benefit package in accordance with the
agreement, and I understand that my decision is irrevocable."  McQuade Decl. Ex. 1, at 256-57,
& Ex. 24.

125.   On August 17, 2005, when she signed the acknowledgement form regarding the voluntary termination and severance package, Early did not believe that anyone at Wyeth was retaliating against her because she had made a complaint of race discrimination.  McQuade Decl. Ex. 1, at 259.

126.   On August 17, 2005, when she signed the acknowledgement form regarding the voluntary termination and severance package, Early did not believe that anyone at Wyeth was discriminating against her based on her race.  McQuade Decl. Ex. 1, at 259-60.

127.   As indicated by the acknowledgement form she signed, Early voluntarily accepted a termination and severance package from Wyeth.  McQuade Decl. Ex. 1, at 257-58.

128.   Early did not feel that anyone at Wyeth intentionally tried to force her to leave her employment or accept the severance package.  McQuade Decl. Ex. 1, at 254, 257-58, 275, & Ex. 24.

129.   Early testified that she "no longer had the desire to work" and decided to accept the voluntary termination and severance package because she was "just tired."  McQuade Decl. Ex. 1, at 252-54.

130.   After signing the acknowledgment form on August 17, 2005, Early continued to work at Wyeth until the end of September 2005.  McQuade Decl. Ex. 1, at 263.

131.   Early's employment was not officially terminated until October 7, 2005. McQuade Decl. Ex. 1, at 265.

132.   Early's birthday is October 4th.  McQuade Decl. Ex. 1, at 265.

133.   Early turned 55 on October 4, 2005.  McQuade Decl. Ex. 1, at 266.

134.   With the exception of Early and possibly one other employee, all of the employees that worked in her area who had accepted the voluntary termination and severance

package left their employment on September 30, 2005.  McQuade Decl. Ex. 1, at 265, 269, 277-78.

135.   Early made a special request to Joe Vitanza of Wyeth to see if he would allow her to remain employed through her birthday so that her medical benefits would not lapse.  McQuade Decl. Ex. 1, at 267-69.

136.   Vitanza granted Early's request to remain a Wyeth employee through her birthday.  McQuade Decl. Ex. 1, at 267-69, 278.

137.   By granting Early's request to extend her employment through her birthday, Early acknowledged that Vitanza conferred a special benefit on her that she would not have otherwise been entitled to.  McQuade Decl. Ex. 1, at 270.

**Wyeth's Harassment Policies And Practices**

138.   Wyeth has had a written policy against unlawful discrimination during all times relevant to this action.  Rose Decl., at ¶ 6; McQuade Decl. Ex. 1, & Exs. 28-29.

139.   The purpose of Wyeth's discrimination policy is to ensure that all employees are permitted to work in an environment free from any type of unlawful discrimination or harassment.  Rose Decl., at ¶ 7; McQuade Decl. Ex. 1, & Ex. 28.

140.   Under the policy effective from July 1, 2001 through June 30, 2002, Wyeth employees were "strongly encourage[d]" to promptly report to their immediate manager, any other manager, or their Human Resources representative, "all incidents of discrimination, discriminatory harassment or other inappropriate workplace behavior."  Rose Decl., at ¶¶ 8-9, & Ex. 1; McQuade Decl. Ex. 1, & Ex. 28.

141.   If a complaint of discrimination is reported to the Human Resources department, Human Resources would then promptly investigate the complaint and advise management on appropriate action.  Rose Decl., at ¶ 11; McQuade Decl. Ex. 1, & Ex. 28.

142.    If, after an investigation is conducted, Wyeth concludes that unlawful harassment or discrimination has occurred in violation of its policies, Wyeth will take appropriate action to correct the situation.  Rose Decl., at ¶ 11; McQuade Decl. Ex. 1, & Ex. 28.

143.    Employees, including managerial personnel, were asked to sign a written acknowledgment, indicating that they had received a copy of Wyeth's Harassment and Discrimination policy and that they understood that it was their responsibility to familiarize themselves with the policy. Rose Decl., at ¶ 12.  Defendants Robert Bracco and Walter Wardrop signed these acknowledgement forms.  Rose Decl., at ¶ 12, & Exs. 2-3.

144.    Wyeth's policy against unlawful discrimination is also included in Wyeth's Code of Conduct.  Rose Decl., at ¶ 14, & Ex. 4.

145.    Bracco and Wardrop signed certificates of compliance, indicating that they had read, understood and would comply with the policies set forth in the Code of Conduct.  Rose Decl., at ¶ 14, & Exs. 5-6.

146.    As referenced in the Code of Conduct, Wyeth makes its discrimination policies, including questions and answers explaining those policies, available to employees through the Human Resources website at http://insidewyeth.com/wyethhr.  Rose Decl., at ¶ 15, & Ex. 7.

147.    In addition to the mechanisms outlined in Wyeth's policy against unlawful discrimination, Wyeth employees may report a complaint of harassment or discrimination through a Compliance Hotline, established in the Fall of 2000, or through an Ethics Hotline, established in the Fall of 2004.  Rose Decl., at ¶ 16.

148.    Wyeth also posts its policies against unlawful harassment in memoranda on bulletin boards at the entrances and exits of the Pearl River plant, and at designated buildings throughout the site.  Rose Decl., at ¶ 17, & Ex. 8.

**Early's Claims Against Wardrop**

149.   At her deposition, Early admitted that the only basis she has for believing that Wardrop discriminated against her based on her race is the alleged comment he made to her in 2001 about sticking needles in a doll:

Q:   So what is your basis for believing that Mr. Wardrop discriminated against you based on your race?

A:   Are you home sticking pins in a doll. That's the only thing that I say Walter did.

Q:   So your only basis for believing he treated you unfairly because of your race is the alleged comment that he made about sticking needles in the doll, is that correct?

A:   Yes, sir.

McQuade Decl. Ex. 1, at 245.

150.   Early also admitted that she does not believe that Wardrop retaliated against her:

Q:   Do you have any reason that he retaliated against you in any way?

A:   No, sir.

McQuade Decl. Ex. 1, at 245, 262.

**Early's Claims Against Bracco**

151.   Early concedes that Bracco helped her during her employment at Wyeth. McQuade Decl. Ex. 1, at 247-48.

152.   For example, in December 2000, Bracco granted a request Early made for an exemption from rotation in the weighing and blending area based on "the nature of the problem and her years of service." McQuade Decl. Ex. 1, at 291, & Ex. 27.

153.   In addition, on another occasion, Bracco authorized the purchase of a pair of custom-made shoes for Early. McQuade Decl. Ex. 1, at 249.

154.   Early essentially admitted that she has no basis for believing that Bracco discriminated against her based on her race:

Q:     Do you think [Bracco] targeted you because of your race?

A:     You have to ask him.

Q:     Do you believe that?

A:     I can't think of anything else.  I can't think of anything that I did that would make him make the [voodoo] accusations against me that he did.  I can't.  I can't.  I can't.

McQuade Decl. Ex. 1, at 248.

155.   Similarly, Early admitted that she has no basis for believing that Bracco retaliated against her for making a complaint of discrimination:

Q:     Do you think [Bracco] ever retaliated against you because you made a complaint of race discrimination?

A:     I never made a complaint of discrimination.  I made complaints of things that were done to me in the area.  Race never came up until I went to labor relations with that [Jose Torres] incident about the [overtime and the] black women, and now race about the voodoo.

Q:     So you don't think that Mr. Bracco took an action against you because you had made a complaint of race discrimination?

A:     I never made a complaint with Bob Bracco for race discrimination.

Q:     So then it has to follow that you don't believe that he took an action against you because you made a complaint of race discrimination.

A:     I believe that Bob Bracco had me on his hit list.  I believe that any and everything I did was put in writing, even the things that I didn't know were in writing.

       Now, why Bob Bracco did it, you have to ask Bob Bracco because I truly don't know.

McQuade Decl. Ex. 1, at 250-51.

156.   Early also explained that, after Bracco made the alleged comment regarding voodoo in March 2001, "Bracco left [her] alone" and she "never had another complaint against Bob.  Never had another incident."  McQuade Decl. Ex. 1, at 251.

157.    Similarly, Early testified that she had no idea whether her supervisors had racial animus toward her in making job assignments:

Q:      So you have no reason to believe that the individual supervisors who were making these decisions had any discriminatory animus against you?

A:      I have no idea what someone felt against me because of my race. All I know is the supervisor does what a department head allows him to do. Now, if it was my race, the color of my eyes, the sound of my voice, I don't know. I just know that I felt targeted.

McQuade Decl. Ex. 1, at 209-210.

158.    Early also admitted at her deposition that she does not believe that she was retaliated against because she made a complaint of race discrimination while she was employed by Wyeth:

Q:      Today, as you sit here in this deposition, do you believe that you were retaliated against because you had made a complaint of discrimination while you were employed at Wyeth.

A:      No sir.

McQuade Decl. Ex. 1, at 298.

159.    Finally, Early testified that she never complained to anyone at Wyeth that she was being retaliated against because of her race. McQuade Decl. Ex. 1, at 255.

Dated: New York, New York
      May 27, 2008

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____

Michael Delikat
James H. McQuade
Mayotta H. Anderson
666 Fifth Avenue
New York, New York 10103
(212) 506-5000

Attorneys for Wyeth Pharmaceuticals, Inc., Walter
Wardrop, and Robert Bracco