UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

DAISY EARLY,                              :

                Plaintiff,      :

    - against -                          :

WYETH PHARMACEUTICALS, INC., WALTER       :
WARDROP and ROBERT BRACCO,
                           :

                Defendants.     :
- - - - - - - - - - - - - - - - - - - - X

07 Civ. 0947 (WCC)

**ECF CASE**

**OPINION
AND ORDER**

**A P P E A R A N C E S :**

THE LAW OFFICES OF STEVEN A. MORELLI
**Attorneys for Plaintiff**
One Old Country Road, Suite 347
Carle Place, New York 11514

STEVEN A. MORELLI, ESQ.

    Of Counsel

ORRICK, HERRINGTON & SUTCLIFFE LLP
**Attorneys for Defendants**
666 Fifth Avenue
New York, New York 10103

MICHAEL DELIKAT, ESQ.
JAMES H. McQUADE, ESQ.
MAYOTTA H. ANDERSON, ESQ.

    Of Counsel

**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff Daisy Early brings this action pursuant to 42 U.S.C. §1981 and the New York State Human Rights Law § 296 against defendants Wyeth Pharmaceuticals, Inc. ("Wyeth"), and two of its individual employees, Walter Wardrop ("Wardrop") and Robert Bracco ("Bracco," and together with Wyeth and Wardrop, collectively, "defendants"). Plaintiff alleges that she suffered adverse employment actions, constructive termination, retaliation for making complaints of discrimination and a hostile work environment due to unlawful discrimination based on her race. Defendants counterclaim, alleging fraud in the inducement and unjust enrichment. Defendants move for summary judgment and plaintiff cross moves for summary judgment on defendants' counterclaims. For the reasons set forth below, the Court grants defendants' motion in its entirety; the Court considers defendants' counterclaims moot and, therefore, does not consider plaintiff's motion for summary judgment.

## BACKGROUND

### I.    <u>The Parties</u>

Unless otherwise indicated, the following facts are undisputed. Wyeth is a company engaged in the development and manufacture of pharmaceutical healthcare and animal products. (Defs. R. 56.1 Stmt. ¶ 1.) Among its various manufacturing sites is a facility located in Pearl River, New York. (*Id.*) Wyeth's Consumer Health Division is located in its Pearl River facility and is responsible for, among other things, the manufacture of healthcare products such as vitamins and nutritional supplements. (*Id.* ¶ 2.) The Consumer Health Division is divided into distinct manufacturing areas, known as "trains" or "primary production units." (*Id.*)

1

The employment structure at the Consumer Health Division consists of pharmaceutical operators who work directly on the manufacturing lines and report to supervisors, who in turn report to managers.  (*Id*. ¶¶ 3-4.) The pharmaceutical operators are union employees, whose employment is governed by a contract between Wyeth and the International Chemical Workers Union, Local 148. (*Id*. ¶ 3.)

Plaintiff is an African-American female who worked at Wyeth's Pearl River facility from 1976 until 2005.  (*Id*. ¶¶ 5, 7.)  Plaintiff was hired in October 1976 as a night-shift supervisor, during which time she reported to a variety of supervisors due to high turnover in supervisory positions. (*Id*. ¶¶ 5-6.)  Plaintiff became a pharmaceutical operator in 1982 and continued to work in that capacity until 2005, when she discontinued her employment with Wyeth.  (*Id*. ¶ 7.)  While working as a pharmaceutical operator, plaintiff again reported to various supervisors, some of whom plaintiff recalled were African American.  (*Id*. ¶ 8; Early Aff. ¶ 2).

Wardrop was employed as a production supervisor in the Consumer Health Division from 1997 to May 2000.  (Defs. R. 56.1 Stmt. ¶ 9.)  The parties dispute the employment relationship between plaintiff and Wardrop.  Defendants contend that Wardrop worked on a different shift than plaintiff did and, thus, did not directly supervise plaintiff unless she worked overtime on the shift that Wardrop supervised.  (*Id*. ¶¶ 9-10.)  Defendants further contend that there is no evidence that plaintiff did in fact work overtime during Wardrop's shift.  (Defs. R. 56.1 Reply ¶ 10.)  Plaintiff counters that Wardrop directly supervised her three-to-eleven overtime shift from 1997 through May 2000 and, further, that in January 2004 Wardrop was transferred to a supervisory position on plaintiff's train.  (Pl. R. 56.1 Counterstmt. ¶ 10.)

Bracco served as a "Department Head and/or an Associate Director" in the Consumer Health

Division from June 1999 to November 2003.  (Defs. R. 56.1 Stmt. ¶ 11.)  The parties agree that Bracco did not directly supervise plaintiff at any time; however, plaintiff adds that as Department Head, all supervisors reported to Bracco.   (*Id*. ¶ 12; Pl. R. 56.1 Counterstmt. ¶ 12.)

## II.     Employment Contract and Grievance Procedures

As a union employee, plaintiff's terms of employment were governed by the union contract, which plaintiff read and with which plaintiff familiarized herself.  (Defs. R. 561. Stmt. ¶¶ 13-14 (citing McQuade Decl., Ex. 1 at 30).)  Plaintiff notes, however, that she did not understand all of the contractual language and that she was not given new copies of the contract as it was renegotiated over the years.  (Pl. R. 56.1 Counterstmt. ¶ 14.)  The union contract contained a formal grievance procedure that included the right to have a grievance adjusted without the intervention of a union representative.  (Defs. R. 56.1 Stmt. ¶¶ 15-16.)  Plaintiff does not dispute the existence of this clause, however, she maintains that she understood that the proper grievance procedure was to report her complaint to her union representative, who would resolve her complaint and inform her of any further steps that might be necessary.  (Pl. R. 56.1 Counterstmt. ¶ 16.)

## III.     Plaintiff's August 1989 Suspension ("Event 1")

In August 1989, plaintiff was engaged in an altercation with her supervisor, Raymond Kelly. (Defs. R. 56.1 Stmt. ¶ 18.)  Plaintiff states that the altercation began because she left her area to go to the bathroom.  (Pl. R. 56.1 Counterstmt. ¶ 18.)  Plaintiff states that Kelly began "yelling and pointing at Plaintiff closely to her face."  (*Id*. ¶ 18.)  Defendants claim that plaintiff responded by telling Kelly to "get the hell out of [her] face."  (Defs. R. 56.1 Stmt. ¶ 18.)  Plaintiff states that she

"told Kelly to leave her alone."  (Pl. R. 56.1 Counterstmt. ¶ 18.)  Plaintiff was suspended after a full

hearing with union representation.[1]  (Defs. R. 56.1 Stmt. ¶ 19.)

At the time of the incident, plaintiff did not state that she believed the disciplinary measures

to be discriminatory.  (*Id*. ¶ 20; Pl. R. 56.1 Counterstmt. ¶ 20.)  Plaintiff notes, however, that a white

male employee left his work area to eat in the canteen and was not admonished by Kelly.  (Pl. R.

56.1 Counterstmt. ¶ 21.)

IV.   **Plaintiff's November 1990 Written Warning ("Event 2")**

On November 2, 1990, plaintiff failed to follow established manufacturing procedures while

mixing a solution.  (*Id*. ¶ 22; Defs. R. 56.1 Stmt. ¶ 22.)  Plaintiff was responsible for signing the

product's batch record, thereby certifying that the product had been made properly.  (Defs. R. Stmt.

¶ 27.)  Butch Babcock, her supervisor at that time, issued a "written interview record," which was

a written warning regarding the incident.  (*Id*. ¶ 23.)  Plaintiff signed the document, thereby

expressing her assent to its content.  (*Id*. ¶ 24.)  The document provided space in which plaintiff

could write a statement of disagreement, which plaintiff declined to do.[2]  (*Id*. ¶ 25.)

Plaintiff believes that Jim Tanner, a white male, and others involved in the mixing of the

batch at issue received no written warnings.  (Pl. R. 56.1 Counterstmt. ¶ 26.) Plaintiff states that she

did complain at the time that she was being treated unfairly, but did not specifically refer to race

---

[1]  Plaintiff claims that the suspension was a three-day suspension; defendants claim that it was a ten-day suspension.  (*Compare* Defs. R. 56.1 Stmt. ¶ 18 *with* Pl. R. 56.1 Counterstmt. ¶ 19.)

[2]  Plaintiff notes that she "never refused to sign a document," but adds that if she did not agree with its content, she would add a comment, which she did not do in this instance.  (Pl. R. 56.1 Counterstmt. ¶ 25.)

discrimination.  (*Id*. ¶ 29.)

Defendants contend that plaintiff played a different role than that of Tanner and other product mixers because, by signing the batch record, she was ultimately responsible for any errors therein. (Defs. R. 56.1 Stmt. ¶ 27.)  Plaintiff does not dispute this, but adds that, in signing the batch record, she relied on the accurate performance of Tanner and other workers.  (Pl. R. 56.1 Counterstmt. ¶ 27.)

The written warning did not directly affect plaintiff's employment.  (Defs. R. 56.1 Stmt. ¶ 30.)  However, plaintiff notes that it contributed to a hostile work environment, leading to emotional instability and stress.  (Pl. R. 56.1 Counterstmt. ¶ 30.)

**V.    Plaintiff's September 1994 Suspension ("Event 3")**

In September 1994, two security guards claimed to have observed plaintiff sleeping while at work.  (Defs. R. 56.1 Stmt. ¶ 31.)  Plaintiff contends that "someone called the guards to report her," but that she does not know who.  (Pl. R. 56.1 Counterstmt. ¶ 32.)  Following a hearing with union representation, plaintiff was suspended for three days.  (Defs. R. 56.1 Stmt. ¶ 31.)  Plaintiff stated that Judy Sperr, the head of the department, defended plaintiff, opposed the suspension and assisted plaintiff in getting the suspension lifted.  (*Id*. ¶ 33.)

Plaintiff maintains that she was not in fact asleep and she refused to sign the interview record, which stated that she was asleep while working.  (Pl. R. 56.1 Counterstmt. ¶ 32.1.)  According to the suspension report, plaintiff stated that "she leaned on her arm and briefly fell asleep," further explaining that "she was undergoing treatment for asthma and had been using two medications."  (McQuade Decl., Ex.1 at Ex. 12.)

Plaintiff asserts that she observed a number of white workers sleeping on the job and, to her

5

knowledge, they were not punished.  (Pl. R. 56.1 Counterstmt. ¶¶ 34-35.)  Plaintiff concedes,

however, that she did not know if they were on a break or had already punched out.  (McQuade

Decl., Ex. 1 at 105-06.)  During her deposition, plaintiff also stated that, at the time of the incident,

"my department head fought for me.  I don't think she discriminated against me. . . . [i]n 1994, no,

I did not feel discriminated against."  (*Id*. at 107.)


### VI.     Plaintiff's May 2000 Written Interview Record ("Event 4")

In May 2000, plaintiff became involved in an altercation with her then supervisor, Renardz

Sylvain, because he instructed her to go home after one shift, while she had expected to work a

double shift.  (Pl. R. 56.1 Counterstmt. ¶ 36.)  Plaintiff states that Sylvain has done the same thing

to other people.  (Morelli Decl. Ex. A at 120.)  Plaintiff admits that she cursed at Sylvain and, in her

statement at that time, apologized to the department.  (*Id*. at 118-19.)  Another supervisor, Todd

Davenport, issued a written interview record in connection with this incident.  (Defs. R. 56.1 Stmt.

¶ 37.)  Plaintiff contends that Bracco instructed Davenport to issue the written interview record,

however, she has no first-hand knowledge of that allegation.  (Morelli Decl., Ex. A at 124.)


### VII.    Plaintiff's October 2000 Verbal Counseling ("Event 5")

In October 2000, plaintiff failed to follow proper operating procedures for checking in

material prior to processing.  (Defs. R. 56.1 Stmt. ¶ 43; McQuade Decl., Ex. 1 at Ex. 17.)  Plaintiff's

supervisor, Davenport, issued a "Formal Verbal Counseling" to plaintiff and plaintiff signed the

document without providing any written comment.  (Defs. R. 56.1 Stmt. ¶ 43; McQuade Decl., Ex.

1 at Ex. 17.)  The Formal Verbal Counseling document notes that plaintiff's "job performance has

been very well [sic] over the last few months and management believes this deviation is an anomaly." (McQuade Decl., Ex. 1 at Ex. 17.)

While the verbal counseling came from Davenport, plaintiff believes that Bracco told Davenport to issue the verbal counseling, pointing out that Davenport and Bracco met to discuss the incident and that the decision to write up an employee always came from Bracco. (Pl. R. 56.1 Counterstmt. ¶ 45.) Defendants counter that plaintiff has no first-hand knowledge of Bracco's alleged involvement and point to her deposition which states, in pertinent part:

> Q.    How do you know that Mr. Bracco had any involvement with this?
> A.    I don't know.
> Q.    You don't know.
> A.    I don't know. But any time a supervisor wrote you up, it came from Bob Bracco.
> Q.    What's your basis for saying that? Do you have any basis for saying that Mr. Bracco had any involvement with this? This performance counseling document was signed and issued by Mr. Davenport.
> A.    He had to get the okay in order to do that from Mr. Bracco.
> Q.    Do you know that?
> A.    No, Sir.

(McQuade Decl., Ex. 1 at 129.)

The disciplinary action did not directly affect plaintiff's employment. (Defs. R. 56.1 Stmt. ¶ 46.) However, plaintiff notes that it contributed to a hostile work environment, leading to emotional instability and stress. (Pl. R. 56.1 Counterstmt. ¶ 30.)

## VIII.   **Plaintiff's March 2001 Requests for Overtime Shift Change ("Event 6" and "Event 7")**

For a period of time beginning in March 2001, Wyeth adopted a policy that required all pharmaceutical operators to work overtime on Saturdays. (Defs. R. 56.1 Stmt. ¶ 47.) Under that policy, on Saturdays employees would work the same shift to which they were assigned during the week. (*Id.*) Therefore, plaintiff was assigned to the day shift on Saturday because she worked the

day shift during the week. (*Id.* ¶ 48.) Plaintiff submitted directly to Bracco a request to switch the first Saturday shift that she was to work with that of another employee so that plaintiff could work the night shift. (*Id.* ¶¶ 49, 52; Pl. R. 56.1 Counterstmt. ¶ 49.) Plaintiff made this request based on the recommendation of Social Services that she become involved in her granddaughter's activities, such as basketball games, which took place on Saturdays.[3] (Pl. R. 56.1 Counterstmt. ¶ 51.) Bracco granted this request. (Defs. R. 56.1 Stmt. ¶ 52.)

Sylvain, an African American, supervised plaintiff's Saturday night shift.[4] (Defs. R. 56.1 Stmt. ¶ 54.) Plaintiff had expected to work "Train 2" when she arrived at the Saturday night shift because that was the train to which she was usually assigned. (Pl. R. 56.1 Counterstmt. ¶ 52.) Upon arriving at work, Sylvain instead assigned plaintiff to work "Train 1." (*Id.*) Plaintiff states that this action was improper because employees with the most seniority, as plaintiff had, were generally not reassigned to different trains. (*Id.* ¶¶ 52-53.) Plaintiff adds that Bracco, in this incident, did not act improperly towards her, but rather accommodated her needs by changing her shift. (*Id.* at 53.)

After supervising plaintiff's Saturday night shift, Sylvain complained to Bracco that working with plaintiff did not go well and Sylvain requested that he and plaintiff not work together again.

---

[3] Defendants point to an inconsistency between plaintiff's stated reason for requesting the shift change at the time, "I have three children in my care that I must transport to various activities on Saturday beginning at 9:30 am and ending at 5:30 pm. These activities are mandated by the state," and the reason that she later gave at her deposition. (Defs. R. 56.1 Stmt. ¶ 50 (citing McQuade Decl., Ex. 1 at Ex. 18).) Later, note defendants, plaintiff stated that she requested the shift change based on the basketball game schedule of only one of her grandchildren and that Social Services did not mandate it, but rather recommended it. (Defs. R. 56.1 Stmt. ¶ 51 (citing McQuade Decl., Ex. 1 at 136-37).)

[4] Defendants state that Sylvain is African American, citing plaintiff's deposition; however the Court has found no reference to Sylvain's race on the pages cited. (Defs. R. 56.1 Stmt. ¶ 54 (citing McQuade Decl., Ex. 1 at 142-45).) Bracco does, however, state in his deposition that he believes that Mr. Sylvain is African American. (McQuade Decl., Ex. 2 at 49.)

(Defs. R. 56.1 Stmt. ¶ 55.)  Plaintiff contends that what Bracco called plaintiff's "harassment" of Sylvain was in fact plaintiff's attempt to notify Sylvain of metal and string in the product that she was working on.  (McQuade Decl., Ex. 1 at 141.)

The following Saturday in March 2001, plaintiff again requested to change from the day shift to the night shift.  (Defs. R. 56.1 Stmt. ¶ 56.)  The second request was denied.[5]  (*Id*.)  After learning that her request had been denied, plaintiff called union shop steward Jerry Gass and reported that she had been treated unfairly, however, plaintiff did not claim that she had been discriminated against based on her race.  (*Id*. ¶ 57.)  Plaintiff also called union representative Jeff Gathers, and together, plaintiff and Gathers spoke to Bracco about the denial of plaintiff's second request for a shift change.  (*Id*. ¶ 58.)  Plaintiff contends that, during the course of the meeting, Bracco changed the reason for denying plaintiff's request from "poor work performance" to "harass[ing] Sylvain during the previous weekend shift they worked together."  (Pl. R. 56.1 Counterstmt. ¶ 59 (citing Morelli Decl., Ex. A at 155-56).)  Defendants counter that Bracco did not change his reason for the denial, but rather initially referred to poor performance and then, by way of clarification, elaborated that Sylvain had reported that plaintiff had harassed him.  (Defs. R. 56.1 Reply ¶ 59 (citing McQuade Decl., Ex. 1 at 141, 150-51).)  Plaintiff claims that, during the meeting, she told Bracco that she believed that the refusal to grant her shift-change request was discriminatory because another employee, Sue Tomkins, had been granted shift changes to sunbathe.  (Defs. R. 56.1 Stmt. ¶ 60.)

---

[5]  The record is unclear as to who initially denied the request, however, Bracco affirmed that denial after speaking to plaintiff.  (Morelli Decl., Ex. B at 47.)

IX.   **June 2001 Alleged Comments Regarding Voodoo ("Event 8")**

Bracco was out of work on a medical leave for a period of time.[6]  (*Id*. ¶ 63.)  Plaintiff claims that, upon his return, Bracco made various comments about her to others regarding voodoo, though plaintiff herself never heard such comments.  (*Id*. ¶¶ 64-65.)  Plaintiff points to the following three claimed incidents: (1) Crystal Bullock told plaintiff that when Bullock was in the inspection area, Bullock told Bracco that she prayed for him, to which Bracco responded "unlike Daisy" and showed her spots on his body; (2) Leon Williams told plaintiff that he heard Bracco state that plaintiff attempted to put voodoo on him (Bracco); and (3) Howard Henry told plaintiff that Henry spoke to Bracco during Bracco's medical leave, during which conversation Bracco brought up plaintiff's name and then Henry changed the subject.  (Pl. R. 56.1 Counterstmt. ¶¶ 64.1-64.3.)  Bracco denies ever having used the word "voodoo" in the workplace and likewise denies that he ever made the statements to which plaintiff refers above.  (*Id*. ¶ 66; Defs. R. 56.1 Stmt. ¶ 66.)

During the same time period, plaintiff claims that Wardrop approached her and asked "what [she] was doing sticking pins in a doll, what have I ever done to you."  (Pl. R. 56.1 Counterstmt. ¶ 67.)  Wardrop denies ever making that statement to plaintiff.  (*Id*. ¶ 68.)

Plaintiff stated that she complained about these incidents to Davenport, to other co-workers, to the medical department, and to union representative Gathers; however, plaintiff never asked that a formal complaint be lodged on her behalf.  (*Id*. ¶¶ 69-70; Defs. R. 56.1 Stmt. ¶¶ 69-70.)  Plaintiff

---

[6]  It appears that plaintiff disputes this, noting that defendants failed to provide "a proper citation to the information regarding Bracco's leave of absence."  (Pl. R. 56.1 Counterstmt. ¶ 63.) While defendants' citation did not refer to the dates of his absence, plaintiff referenced Bracco's illness and his later return to work in her deposition and likewise in plaintiff's Rule 56.1 Counterstatement, therefore, for purposes of the present motions, this Court accepts as fact that Bracco took a leave of absence for an unspecified period of time due to illness.  (Morelli Decl., Ex. A at 161; Pl. R. 56.1 Counterstmt. ¶ 64.3.)

stated that she understood that she had the right to complain to the human relations department if she felt that she was being discriminated against, but that "it did not come to [her] mind" to go to human resources and that she thought that talking about the problem to the union and medical department meant that it would be taken care of.  (McQuade Decl., Ex. 1 at 173.)

**X.**   **Plaintiff's September 2002 Argument With Ken Flowers ("Event 9")**

In September 2002, plaintiff claims that supervisor Ken Flowers accused her of failing to clean up her work areas.  (Defs. R. 56.1 Stmt. ¶ 72.)  Plaintiff maintains that this accusation was unfounded.  (Pl. R. 56.1 Counterstmt. ¶ 72.)  Plaintiff asserts that an altercation ensued between herself and Flowers, during which Flowers followed her around the room for forty-five minutes and that both Flowers and plaintiff raised their voices to each other.  (Defs. R. 56.1 Stmt. ¶ 73; Pl. R. 56.1 Counterstmt. ¶¶ 72-73.)

Following the incident, union representative Gathers approached plaintiff to discuss what had happened and to discuss the various witnesses who claimed to have seen the incident.  (Pl. R. 56.1 Counterstmt. ¶ 74.)  At the conclusion of the meeting Flowers apologized and asked if they could just start over.  (Defs. R. 56.1 Stmt. ¶ 74.)

Plaintiff was not disciplined based on the incident with Flowers and it had no effect on her employment, but plaintiff asserts that it contributed to an overall hostile work environment and exacerbated plaintiff's stress, anxiety and mental health condition stemming from the voodoo incident.  (Defs. R. 56.1 Stmt. ¶ 75; Pl. R. 56.1 Counterstmt. ¶ 75.)

**XI.**   **Plaintiff's Work Assignments From 2000 Through 2005 ("Event 10")**

From 2000 to 2005, plaintiff was assigned to work with pan coaters in the compression area by herself, which plaintiff claimed was unfair because that job is typically assigned to two workers rather than one.  (Defs. R. 56.1 Stmt. ¶ 78; Pl. R. 56.1 Counterstmt. ¶ 78.)  Running pan coaters and working the compression area were part of plaintiff's job responsibilities, however, plaintiff contends that she was assigned to these areas more frequently than were white workers.  (Defs. R. 56.1 Stmt. ¶¶ 79-80; Pl. R. 56.1 Counterstmt. ¶¶ 79-80.)  Plaintiff was unable to identify other workers who she believed were not assigned to the pan coating and compression area as frequently as she was.  (Defs. R. 56.1 Stmt. ¶ 81.)  Plaintiff was unable to name the supervisors who assigned her to these areas.  (*Id*. ¶ 82; Pl. R. 56.1 Counterstmt. ¶ 82.)

Plaintiff complained about her job assignments but never claimed that she was discriminated against based on her race in connection with her job assignments.  (Defs. R. 56.1 Stmt. ¶ 83 (citing McQuade Decl., Ex. 1 at 206-09).)

**XII.**   **Supervisor Dubler's Alleged Request for Items in Plaintiff's Pockets ("Event 11")**

On one occasion, the date of which plaintiff is unsure, her supervisor Greg Dubler allegedly requested that plaintiff give him what she had in her pockets.  (Defs. R. 56.1 Stmt. ¶ 85.)  Plaintiff responded that she did not have to give him what she had in her pockets and "that was the end of it." (*Id*. ¶ 86 (quoting McQuade Decl., Ex. 1 at 211).)

Foreign medications are banned from Wyeth's sterile production floor and, therefore,

supervisors sometimes ask employees if they have objects in their pockets.[7]  (Defs. R. 56.1 Stmt. ¶ 88.)  Plaintiff contends that other African-American employees told her that Dubler, on various occasions, also asked them what was in their pockets and plaintiff is unsure as to whether Dubler questioned white employees in the same way.  (Defs. R. 56.1 Stmt. ¶¶ 89-90.)

The incident had no direct adverse effect on her employment, although plaintiff contends that it contributed to overall hostility in the work place.  (*Id*. at ¶ 91; Pl. R. 56.1 Counterstmt. ¶ 91.)  Plaintiff did not file a grievance in connection with this incident.  (Defs. R. 56.1 Stmt. ¶ 92.)

## XIII.   **Supervisor Dubler's Alleged Threat ("Event 12")**

Plaintiff contends that at some point during her employment, the date of which she is unsure, Dubler threatened her job based on the number of paperwork errors that she had made.[8]  (Defs. R. 56.1 Stmt. ¶¶ 94-95.)  Plaintiff does not dispute the fact that she did make the paperwork mistakes that Dubler referenced and that no action was ever taken against her with respect to those errors.  (*Id*. ¶ 96 (citing McQuade Decl., Ex. 1 at 218).)  Plaintiff states that she had heard from a co-worker that he had more than three paperwork errors, but that his job had never been threatened. (Pl. R. 56.1 Counterstmt. ¶ 96.)

---

[7]  Defendants state that the practice was "not uncommon," while plaintiff contends that the practice was "not common."  (*Compare* Defs. R. 56.1 Stmt. ¶ 88 *with* Pl. R. 56.1 Counterstmt. ¶ 88.)

[8]  The record is unclear as to the nature of the job threat.  (*See* McQuade Decl., Ex. 1 at 216-17.)

13

## XIV.   **Dubler's Supervision of Early ("Event 13" and "Event 14")**

Plaintiff contends that on at least four occasions, the dates of which she is unsure, Dubler hid behind machinery in order to scrutinize plaintiff's work.  (Defs. R. 56.1 Stmt. ¶¶ 97-98 (citing McQuade Decl., Ex. 1 at 219-21).)  Plaintiff states that she is aware of one other employee whom Dubler scrutinized in this manner but does not know if he did so to any other employees.  (Defs. R. 56.1 Stmt. ¶ 99 (citing McQuade Decl., Ex. 1 at 223).)

Plaintiff further contends that, on three or four occasions, Dubler, while acting as plaintiff's supervisor, asked her to stay late, while other employees were permitted to turn their machines off and leave work.  (Defs. R. 56.1 Stmt. ¶ 101.)  Plaintiff was the only employee required to stay late.[9] (*Id.* ¶ 101.)

## XV.   **Incorrect Overtime Charges in 2005 ("Event 15")**

During February 2005, plaintiff complained to Wardrop that Jose Torres, her overtime shift supervisor, had improperly marked an absence as unauthorized when in fact plaintiff's absence had been authorized.  (*Id.* ¶¶ 102-03.)  Wardrop states that he contacted Torres and instructed him to correct the improper overtime charge.[10] (*Id.* ¶ 106.)  By May 2005, plaintiff's improper overtime charge had not been corrected and Torres had made two more improper time charges to plaintiff;

---

[9] It appears from the record that both white and African-American employees were sent home before plaintiff.  (McQuade Decl., Ex. 1 at 227, Q: "So the white pharmaceutical operators were permitted to leave on these occasions, correct?"  A: "Yes."  Q: "And the black pharmaceutical operators also were permitted to leave on these three or four occasions as well?" A: "I know that I was the only one on the floor.")

[10] Plaintiff states that Torres told plaintiff that Wardrop never told him to correct the charge.  (Pl. R. 56.1 Counterstmt. ¶ 107.)

plaintiff informed Wardrop of these facts.  (*Id*. ¶¶ 107-08.)  Wardrop states that he again told Torres to correct plaintiff's improper overtime charges.[11]  (*Id*. ¶ 107.)

Plaintiff also told Wardrop that Torres's actions had been discriminatory.  (*Id*. ¶ 108.)  In response to that complaint, Wardrop contacted Wyeth's Labor Relations and Human Resources Departments, which initiated an investigation.  (*Id*. ¶¶ 109-10.)  After conducting the investigation, which included interviews with plaintiff and several supervisors, including Torres, the Labor Relations and Human Resources Departments concluded that Torres had committed several violations of Wyeth policy, both related and unrelated to plaintiff.  (*Id*. ¶¶ 111-12, 115.)  The Department found that Torres had, *inter alia*, taken excessively long breaks, left the production area unsupervised, used a Wyeth telephone card for unauthorized calls and used profanity in the work place.  (*Id*. ¶ 115.)  Further, with respect to plaintiff, Torres was found to have been insubordinate to Wardrop by failing to follow his instructions regarding correcting improper overtime charges to plaintiff and to have acted vindictively towards plaintiff in making her work assignments and making improper overtime charges.  (*Id*. ¶ 116.)

Wardrop states that, based on that investigation, he terminated Torres's employment effective as of June 3, 2005.  (*Id*. ¶¶ 117-18.)  Wardrop further states that he contacted plaintiff and informed her that he had decided to terminate Torres's employment based on the results of the investigation into her complaint.  (*Id*. ¶ 119.)  The improper overtime charges to plaintiff were also corrected.  (*Id*. ¶ 120.)  The overtime charges were "no longer relevant as [she] did not work overtime after the incident."  (Early Aff. ¶ 58.)

---

[11]  Plaintiff states that Torres told plaintiff that Wardrop never told him to correct the charges.  (Pl. R. 56.1 Counterstmt. ¶ 107.)

XVI.   **Termination and Severance Package**

By memorandum dated July 7, 2005 (the "Memo"), Wyeth offered a voluntary termination and severance package to eligible employees, a group which included plaintiff.  (Defs. R. 56.1 Stmt. ¶¶ 121-22.)  Plaintiff decided to accept this package.  (McQuade Decl., Ex. 1 at 252.)  On August 17, 2005, plaintiff signed an acknowledgment form that stated in relevant part: "I have read the [Memo], understand [it] and voluntarily enter into it without coercion and with the knowledge of the nature and consequences thereof.  I accept the opportunity to volunteer for release in a Transition Benefit Package in accordance with the Agreement, and I understand that my decision is irrevocable."  (Defs. R. 56.1 Stmt. ¶ 124 (quoting McQuade Decl., Ex. 24).)

At the time plaintiff signed the severance agreement she did not believe that anybody at Wyeth was discriminating against her based on her race and neither did she believe that anybody was retaliating against her based on prior complaints of race discrimination.[12]  (Defs. R. 56.1 Stmt. ¶¶ 125-26 (citing McQuade Decl., Ex. 1 at 259-60); Pl. R. 56.1 Counterstmt. ¶¶ 125-26.)

It appears from the record that plaintiff's last day of work was expected to be at the end of September.  (McQuade Decl., Ex. 1 at 267-70.)  Plaintiff requested to have her termination date delayed until after her fifty-fifth birthday, which was October 4, 2005 because this would allow her to receive full medical benefits.  (*Id.*; Defs. R. 56.1 Stmt. ¶¶ 133, 135.)  This request was granted and plaintiff remained an employee of Wyeth until October 7, 2005.  (Defs. R. 56.1 Stmt. ¶¶ 131, 136.)

---

[12]  Plaintiff does not dispute these statements, but adds that she could "no longer endure the discrimination and hostile work environment."  (Pl. R. 56.1 Counterstmt. ¶¶ 125-26.)

DISCUSSION

I.     **Legal Standard**

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant.  *See Anderson*, 477 U.S. at 255.  To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof. . . .  The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial. . . .  A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial. . . .  The mere existence of a scintilla of evidence supporting the non-movant's case is insufficient to defeat a motion for summary judgment.

*Brooks v. Di Fasi*, 1997 U.S. Dist. LEXIS 11162, at *6-7 (W.D.N.Y. July 30, 1997) (internal quotation marks and citations omitted).

17

II.     **Timeliness of the Claims**

The statute of limitations on claims brought pursuant to New York Human Rights Law is three years and the statute of limitations on federal claims brought under Section 1981 is four years. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004) (citing 28 U.S.C. § 1658); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998). Plaintiff filed her Complaint on January 12, 2007; thus, defendants argue that all state claims arising before January 12, 2004 and all federal claims arising before January 12, 2003 should be dismissed as time barred. Plaintiff contends that all of her claims should be considered timely under the continuing violation doctrine.

Set forth in the "Background" section above are the fifteen events that give rise to the claims now before the Court. Of the fifteen alleged events, Event 10 (plaintiff's work assignments from 2000 to 2005) and Event 15 (improper overtime charges in February 2005) are timely as both occurred within the statutory period. Event 11 (Dubler's alleged demand of the contents in plaintiff's pocket), Event 12 (threats to plaintiff's job due to her paperwork errors), Event 13 (Dubler's supervision of plaintiff) and Event 14 (Dubler's request that plaintiff stay at work while co-workers left the premises) all occurred on dates of which plaintiff is unsure.

All other events, Event 1 (plaintiff's August 1989 suspension), Event 2 (plaintiff's November 1990 written warning), Event 3 (plaintiff's September 1994 suspension), Event 4 (plaintiff's May 2000 written interview record), Event 5 (plaintiff's October 2000 verbal counseling), Events 6 and 7 (plaintiff's March 2001 requests for overtime shift changes), Event 8 (June 2001 alleged comments regarding voodoo) and Event 9 (plaintiff's September 2002 argument with Ken Flowers), occurred prior to the statutory period. Plaintiff contends that the events that occurred outside of the limitations

period are part of a continuing violation of the hostile work environment and disparate treatment
allegations, as well as background information to establish those claims.

### A.   <u>Continuing Violation Doctrine</u>

Under the continuing violation doctrine, a plaintiff may bring suit based on conduct that
occurred outside of the statute of limitations period, provided that the conduct is part of specific
discriminatory policies or practices.  *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994).  The
policy need not be "formal" or "widespread," but the employer must permit the conduct "to continue
unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or
practice of tolerating such discrimination."  *Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir.
2001).

As a preliminary matter, defendants assert that plaintiff is precluded from invoking the
continuing violation doctrine because she failed to specifically invoke the doctrine in her Complaint.
Defendants cite *Miller v. International Telephone and Telegraph Corp.*, 755 F.2d 20 (2d Cir. 1985)
and *Carmellino v. District 20 of New York City Department of Education*, 2006 WL 2583019, at *8
(S.D.N.Y. Sept. 6, 2006).  Reliance on either case is misplaced as both cases involve the Age
Discrimination in Employment Act and its specific filing requirement with the Equal Employment
Opportunity Commission.  Moreover, *Miller* involved a claim where plaintiff specifically alleged
in his complaint that the most recent violation occurred before the statutory period.  755 F.2d at 25.
Plaintiff in the instant case made no such stark admission as to the untimeliness of her Complaint,
but rather stated that she was subject to "a hostile working environment and an *ongoing* atmosphere
of adverse acts which went *unabated*" until a time within the statutory period.  (Complt.¶¶ 52-53

(emphasis added).)  *See generally Fitzgerald*, 251 F.3d at 363 (finding that plaintiff sufficiently invoked the continuing violation doctrine in an earlier administrative proceeding by stating that the hostile work environment continued for two and a half years).  Therefore, plaintiff is not precluded from invoking the continuing violation doctrine because of a defect in her Complaint, as defendants argue.

In 2002, the Supreme Court held that the continuing violation doctrine will not apply to "discrete acts of discrimination or retaliation that occur outside the statutory time period," explaining that discrete acts will not converge into "a single unlawful practice for the purpose[] of timely filing."  *Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 111-12 (2002).  Therefore, the separate and discrete acts of discrimination and retaliation alleged to have occurred prior to January 2003, including verbal and written warnings, suspensions and work assignments, fall outside the scope of the continuing violations doctrine as set forth in *Morgan*.  *See Henry v. Wyeth Pharms., Inc.*, 2007 WL 2230096, at *28 (S.D.N.Y. July 30, 2007) ("[I]n the wake of *Morgan*, the continuing violation doctrine no longer applies to discrete discriminatory acts.").  Accordingly, all of plaintiff's disparate treatment claims and retaliation claims based on conduct that occurred prior to January 2003 are dismissed as time barred under the statute of limitations.

In *Morgan*, the Supreme Court distinguished the invocation of the continuing violation doctrine as applied to claims of hostile work environment from claims arising out of separate and discrete acts of discrimination. 536 U.S. at 105.  With respect to the hostile work environment claim in the case at bar, while several of the events supporting this claim occurred outside of the statutory period, they may still be found to be part of the actionable hostile work environment claim because at least one event, here, plaintiff's work assignments from 2000 to 2005, occurred within the

20

statutory period. *Id.* at 105, 120-21 ("consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period, is permissible for the purpose[] of assessing liability, so long as an act contributing to that hostile work environment takes place within the statutory time period."). Therefore, plaintiff's hostile work environment claim is timely and the Court will consider all relevant events.

### III.    Disparate Treatment Claims

As a preliminary matter, employment discrimination claims brought under the New York Human Rights Law and under Section 1981 are evaluated under the same standards that apply to Title VII cases. *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *Shider v. Commc'n Workers of Am.*, 2004 WL 613093, at *4 (S.D.N.Y. Mar. 29, 2004), *aff'd*, 2005 WL 2650007 (2d Cir. Oct. 17, 2005).

Under the *McDonnell Douglas* burden-shifting framework set forth by the Supreme Court, a plaintiff who claims to have been subjected to race discrimination in violation of Title VII must first make a *prima facie* showing of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff sets forth a *prima facie* case by establishing that (1) she is a member of a protected class; (2) she is qualified for the position that he held or sought; (3) she suffered an adverse employment action; and (4) the adverse employment action gave rise to an inference of discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Henry*, 2007 WL 2230096, at *25. At the summary judgment stage under the *McDonnell Douglas* framework, plaintiff's burden on his *prima facie* case is *de minimus*. *Dister v. Continental Group Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988).

If the plaintiff sets forth a *prima facie* case of discrimination, then there is a presumption of discrimination and the burden of production shifts to the defendants to articulate a legitimate, nondiscriminatory basis for their actions.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *McDonnell Douglas*, 411 U.S. at 802; *see also St. Mary's Honor Ctr.*, 509 U.S. at 506-07. Defendants meet this burden by introducing admissible evidence establishing a non-discriminatory rationale which, if believed by the trier of fact, would support the finding that race discrimination did not underlie the adverse employment act.  *St. Mary's Honor Ctr.*, 509 U.S. at 507.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253. Therefore, if the defendant carries his burden of production, then the presumption of discrimination raised by the *prima facie* case is rebutted and the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the defendant's proffered, non-discriminatory rationale is, in fact, merely a pretext for discrimination.  *Id*.

While summary judgment must be granted with caution in employment discrimination actions, it "remains available to reject discrimination claims in cases lacking genuine issues of material fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).  Thus, "even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.").

Plaintiff's timely claims of disparate treatment appear to be based on the following events:

22

Event 12 (threats to plaintiff's job due to her paperwork errors) and Event 15 (failure to correct improper overtime charges from February 2005).[13] (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 16.)

### A.      Supervisor Dubler's Alleged Threat to Suspend Plaintiff (Event 12)

As described above, the legal standard for a disparate treatment claim requires plaintiff to first set forth a *prima facie* case establishing that (1) she is a member of a protected class; (2) she is qualified for the position that she held or sought; (3) she suffered an adverse employment action; and (4) the adverse employment action gave rise to an inference of discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 506; *Henry*, 2007 WL 2230096, at *25. A materially adverse change in employment "include[s] discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d. Cir. 1999). It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d. Cir. 2000) (internal quotation marks and citations omitted).

In this case, plaintiff avers that Dubler, a supervisor, threatened her job based on the number

---

[13]  The rest of plaintiff's disparate treatment claims appear to be based on: Event 1 (plaintiff's August 1989 suspension); Event 2 (plaintiff's November 1990 written warning); Event 3 (plaintiff's September 1994 suspension); Event 4 (plaintiff's May 2000 written interview record); Event 5 (plaintiff's October 2000 verbal counseling); Event 6 (March 2001 requests for overtime shift change); Event 7 (March 2001 denial of plaintiff's shift-change request); and Event 9 (September 2002 argument with Ken Flowers). (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 16.) As described above, each of these claims are time-barred because they are discrete acts of discrimination occurring outside of the statutory period. *Morgan*, 536 U.S. at 105, 111-12. Further, while Event 10 (plaintiff's work assignments) is timely, plaintiff appears to base only her hostile work environment claim on this event and not her disparate treatment claim. (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 16.) We, therefore, discuss Event 10 in the hostile work environment section of this Opinion.

of paperwork errors that she had made and that this threat constitutes an adverse employment action. (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 16.)  Plaintiff states that, apart from the threat, no other action was taken against her with respect to the mistakes that she had made in her paperwork.  A threat is not, by itself, an adverse employment action.  *Huaman v. Am. Airlines, Inc.*, 2005 WL 2413189, at *6 (E.D.N.Y. Sept. 29, 2005); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001).   Rather, an adverse employment action must "affect ultimate employment decisions such as promotion, wages, or termination."  *Regis v. Metro. Jewish Geriatric Ctr.*, 2000 WL 264336, at *8 (E.D.N.Y. Jan. 11, 2000).  By plaintiff's own admission, Dubler's threat did not result in any employment action being taken against her.  (McQuade Decl., Ex. 1 at 218.)

### B.      Incorrect Overtime Charges in 2005 (Event 15)

Plaintiff also claims that Torres, her overtime supervisor, had improperly marked an authorized absence as unauthorized, constituting disparate treatment.  As set forth above, one element of plaintiff's *prima facie* case is that she suffered an adverse employment action.  *Henry,* 2007 WL 2230096, at *25.  An adverse employment action may be "indicated by . . . a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices."  *Galabya*, 202 F.3d at 640 (internal quotation marks and citations omitted).  While there are no bright-line rules as to what constitutes an adverse employment action, "not every unpleasant matter" creates a cause of action.  *Id.*

Plaintiff states that the overtime was improperly charged in a way that would affect her right to get overtime in the future, but that all of the improper overtime charges were corrected and that

they were "no longer relevant as [she] did not work overtime after the incident." (Early Aff. ¶ 58; Morelli Decl., Ex. A at 229, 233-34.) No evidence presented has indicated that the improper overtime charges "affect[ed] ultimate employment decisions such as promotion, wages, or termination," as required to constitute an adverse employment action. *Regis*, 2000 WL 264336, at *8.


C. **Atmosphere of Adverse Acts**

Plaintiff argues that if this Court finds that plaintiff has not suffered independently adverse employment actions, summary judgment should still be denied under the theory that such acts, combined, constitute an atmosphere of adverse acts. The Second Circuit has held that "a combination of seemingly minor incidents" may form the basis for an adverse employment action once the incidents "reach a critical mass." *See Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).[14] While most frequently used in the First Amendment context, the atmosphere of adverse acts analysis has been used in Title VII cases in this circuit. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir. 1997); *Garvin v. Potter*, 367 F. Supp. 2d 548, 571 (S.D.N.Y. 2005). Assuming that the ability to aggregate events extends to the establishment of adverse employment actions in the context of this case, which is a determination that the Court need not make to render a decision, no

_____

[14] Defendants argue that *Phillips*, because it is based on a First Amendment retaliation claim, should not govern the Title VII claim at bar. In support of this proposition, defendants cite *Beyer v. County of Nassau*, which held that aggregation of minor acts is improper in a Title VII case. 2006 WL 2729196, at *5-6 (E.D.N.Y. Sept. 25, 2006), *vacated and remanded by Beyer v. County of Nassau*, 524 F.3d 160 (2d Cir. 2008). *Beyer*, however, was overturned by the Second Circuit on the ground that the district court erred in failing to recognize that plaintiff suffered a materially adverse employment action, though the court did not explicitly address the issue of aggregating events. 524 F.3d at 164-65.

reasonable jury could find that the effect of (1) an unfulfilled threat based on paperwork errors, which plaintiff admitted having made, combined with (2) incorrect overtime charges that were remedied before plaintiff suffered any lost wages or was denied any overtime, could together create an atmosphere of adverse employment actions sufficient to set forth a *prima facie* case.

As plaintiff cannot establish a *prima facie* case without showing that she was the victim of an adverse personnel decision, plaintiff's remaining timely disparate treatment claims based on Dubler's threat to plaintiff's job and based on improper overtime charges are dismissed.

**IV.**   **Retaliation Claims**

Plaintiff also claims that she was retaliated against because of her protected speech.[15]  To establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) she was engaged in a protected activity; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2002).

If the plaintiff sets out a *prima facie* case, then the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory rationale for its actions.  *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991).  If the defendant proffers a legitimate, non-retaliatory reason, the

---

[15]  We note that, during plaintiff's deposition, she admitted that she did not believe that she was ever retaliated against.  (Morelli Decl., Ex. A at 298 (Q. "Today, as you sit here in this deposition, do you believe that you were retaliated against because you had made a complaint of discrimination while you were at Wyeth?"  A. "No, sir.").)  There is no indication in the record that plaintiff ever sought to amend or clarify her deposition testimony.  We will still, however, consider the merits of plaintiff's claim of retaliation.

burden of production then shifts back to the plaintiff to introduce evidence that the defendant's reason was a pretext for retaliation. *Id.* The burden of proof and persuasion remains at all times with the plaintiff. *Milano v. Astrue*, 2008 WL 4410131, at *27 (S.D.N.Y. Sept. 26, 2008).

The first element of the *prima facie* case requires a showing that plaintiff engaged in a "protected activity," which refers to actions taken to protest or oppose statutorily prohibited discrimination. *Bryant v. Verizon Commc'ns, Inc.*, 2008 WL 1947082, at * 20 (S.D.N.Y. May 1, 2008). As a public policy matter, speech protections are generally meant to encourage individuals to speak out in furtherance of a public interest without fear of retaliation. Therefore, mere complaints of unfair treatment by an individual are not protected speech because unfair treatment by an employer does not implicate a public interest concern. *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991). However, complaints that the unfair treatment is based on race discrimination in violation of Title VII will render that speech protected from retaliation because race discrimination does implicate a public interest concern. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 291-92 (2d Cir. 1998). The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally. *Dinice-Allen v. Yale-New Haven Hosp.*, 2008 WL 160206, at *4 (D. Conn. Jan. 10, 2008). Plaintiff admits that "[s]ometimes when [she] reported complaints of discrimination she did not necessarily state that she was being discriminated against because she was black," but states that because she would compare herself to white employees, "[d]efendant could reasonably have understood that [she] was complaining of discrimination." (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 21-22.) Still, as plaintiff admitted, "[she] did not want to use the race card." (Early Aff. ¶ 17.) Plaintiff's belief that she was

being discriminated against because of her race, which, she admits, she often failed to disclose, will not convert a typical work-place complaint into a protected activity and, therefore, plaintiff's generalized complaints are not protected speech.

There are, however, two complaints that plaintiff made, which, viewed in the light most favorable to plaintiff, did specify her belief that she was being discriminated against. Those two complaints are: (1) plaintiff's complaint to Bracco regarding Event 7 (the denial of her request for a shift change in March 2001); and (2) plaintiff's complaint to Wardrop regarding Event 15 (failure to correct improper overtime charges from February 2005).[16]

Therefore, only incidents that occurred after March 2001 could constitute adverse acts that occurred in retaliation against plaintiff on account of her protected speech. Those actions were: (1) Event 12 (threats to plaintiff's job due to her paperwork errors)[17] and Event 15 (failure to correct improper overtime charges from February 2005).[18] (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ.

---

[16] Plaintiff also states that she reported that Sylvain was a "Black Hitler" in May 2000 and that this was a complaint of discrimination. (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 21.) This, however, contradicts plaintiff's deposition testimony, wherein she stated that she never complained of race discrimination until she spoke to Bracco about Event 7. (Morelli Decl., Ex. A at 208.) Further, there is no indication that referring to Sylvain, who was black, as a "Black Hitler" is anything more than a derogatory reference to Sylvain.

[17] Plaintiff stated that she did not know when this event occurred and, therefore, it is unclear whether it occurred after plaintiff's protected speech. However, we view the evidence in the light most favorable to the non-moving party on a motion for summary judgment and, therefore, we will assume that this event took place after plaintiff's protected speech.

[18] Plaintiff also argues that Event 2 (plaintiff's November 1990 written warning); Event 3 (plaintiff's September 1994 suspension); Event 4 (plaintiff's May 2000 written interview record); Event 5 (plaintiff's October 2000 verbal counseling); Event 6 (March 2001 requests for overtime shift change); and Event 7 (March 2001 denial of plaintiff's shift-change request) constituted retaliatory adverse acts (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 25), however, none of these events occurred after plaintiff's protected speech and, therefore, cannot form the basis of plaintiff's retaliation claim. Plaintiff also argues that Event 9 (the September 2002 argument

J. at 25 (listing the "adverse employment actions" that form the basis of plaintiff's retaliation claim).)

With respect to Event 12, as a preliminary matter, it is not clear that this event is an adverse employment action, as plaintiff admits that, apart from apparent threats to her job, "no action was ever taken against [her]" in connection with the paperwork errors.  (Morelli Decl., Ex. A at 218.) Still, the standard for an adverse employment act in the retaliation context is lower than the standard for a disparate treatment claim as, for a retaliation claim, a plaintiff need only show that the action would have dissuaded a reasonable worker from speaking out against discrimination.  *Burlington N. & Santa Fe Ry., Co. v. White*, 548 U.S. 53, 68 (2006).  Therefore, we accept that a job threat may have dissuaded a reasonable worker from speaking out against discrimination and find that, for the purposes of this motion, plaintiff has satisfied the second prong of her *prima facie* case of retaliation arising out of Event 12.  However, this claim cannot withstand the instant motion for summary judgment because defendants have proffered a legitimate, non-discriminatory reason for Event 12. That is, plaintiff did, in fact, make the paperwork errors on account of which her job was threatened, (McQuade Decl., Ex. 1 at 217-18), and plaintiff does not prove that this was merely a pretext for retaliation.  While plaintiff alleges that white workers were not threatened based on their paperwork errors, this opinion is based on plaintiff's unsubstantiated belief, as she admitted that she does not have access to information regarding defendants' response to other employees' paperwork errors. (*Id*. at 218.)  Further, the instant claim is one of retaliation.  Therefore, it is not a question of whether the paperwork errors were a pretext for discrimination, but rather, whether the paperwork errors were

---

with Ken Flowers) was a retaliatory adverse act (*id*.), however, while this event did occur after plaintiff's protected speech, it is an alleged discrete act of retaliation occurring outside of the statutory period and, therefore, it is barred by the statute of limitations.  *Morgan*, 536 U.S. at 105, 111-12.

a pretext for retaliation because of plaintiff's protected speech.  Nothing in the record indicates that plaintiff could support such a claim.

Neither can plaintiff's claim that Event 15 was retaliatory withstand the instant motion for summary judgment.  Event 15 refers to the February 2005 incident, in which plaintiff complained to Wardrop that Torres had improperly marked her overtime hours, which allegation a subsequent internal investigation confirmed.  Following that investigation, Torres was fired and plaintiff's hours were restored.  Plaintiff now claims that the delay of three months before the overtime charges were corrected was retaliatory.  (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 25.)  However, Event 15 does not rise to the level of an adverse act.  While the standard for an adverse employment action in a retaliation claim, that is, whether the action would have dissuaded a reasonable worker from engaging in protected speech, is lower than the standard in a disparate treatment claim, the Supreme Court has cautioned that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.  The Court also clarified that it couched the standard in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances [of the case]." *Id*. at 69. Here, plaintiff admits that, upon conclusion of Wardrop's investigation into plaintiff's complaint, her overtime charges were corrected.  (Early Aff. ¶ 58.)  She also admits that the improper overtime charges did not affect her because "[she] did not work overtime after the incident." (*Id*.)  The passage of three months, a period during which defendants were investigating plaintiff's complaint, before the restoration of plaintiff's proper overtime hours can hardly be said to constitute "*material* adversity" where the three-month deprivation had no effect on plaintiff's employment conditions and caused no "injury or harm." *Burlington*, 548 U.S. at 67-68 (emphasis in original).

30

Further, we are not convinced that a reasonable employee in plaintiff's situation would be dissuaded from complaining of race discrimination by the prospect of a delay in the restoration of improperly-charged overtime hours during the pendency of an ongoing investigation into the charges.

For these reasons, plaintiff's claim of retaliation cannot withstand the instant motion for summary judgment and it is, therefore, dismissed.

V.      **Hostile Work Environment Claim**

As a preliminary matter, as set forth above, while several of the incidents that give rise to plaintiff's hostile work environment claim occurred outside of the statute of limitations period, all events relevant to that claim will be considered under the continuing violation doctrine. *Morgan*, 536 U.S. at 105, 120-21.

Section 1981 and New York Executive Law each provide a cause of action for a hostile work environment premised on race-based employment discrimination and each is evaluated under the same framework as Title VII cases.   *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000); *Desir v. Concourse Rehab. & Nursing Ctr.*, 2008 WL 756156, at *4 (S.D.N.Y. Mar. 21, 2008).   Under Title VII, a "'hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive.'" *Whidbee*, 223 F.3d at 69, quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987). To survive a motion for summary judgment, plaintiff must "produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal

quotation marks omitted).  Isolated incidents will generally not suffice, however, a single incident that was "extraordinarily severe" or a "series of incidents [that] were sufficiently continuous and concerted to have altered the conditions of her working environment" will suffice.  *Cruz*, 202 F.3d at 570, quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal quotation marks omitted).  The conduct alleged must be so severe or pervasive as to create both a subjectively and objectively hostile work environment.  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). And plaintiff must show that she was subjected to the hostile work environment because of her membership in a protected class (here, race).  *Brennan v. Metro. Opera Assoc., Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

As the Supreme Court pointed out, a finding of a "hostile" or an "abusive" environment may be made only by looking at the totality of the circumstances.  *Harris*, 510 U.S. at 23.  The inquiry may consider the frequency of the conduct, its severity, whether the conduct was physically threatening or humiliating or merely an offensive utterance, whether it unreasonably interfered with the employee's performance, and whether it affected the employee's psychological well being.  *Id*. Any relevant factor may be taken into account and no single factor is required.  *Id*.

Plaintiff argues that she was subject to systematic and continuous conduct that amounted to a subjectively and objectively hostile work environment.  Plaintiff's claim of hostile work environment appears to be based on the following events:  (1) Event 4, denial of plaintiff's allegedly scheduled overtime shift; (2) Event 6, plaintiff's reassignment to Train 1; (3) Event 7, denial of plaintiff's request for overtime shift change; (4) Event 8, alleged comments regarding voodoo; (5) Event 9, argument with Ken Flowers; (6) Event 10, plaintiff's assignment to work with pan coaters in the compression area; (7) Event 11, Dubler's request that plaintiff give him what she had in her

pockets; (8) Event 12, Dubler's alleged threat to plaintiff's job based on paperwork errors; (9) Event 13, supervisor's alleged observation of plaintiff from behind a machine; and (10) Event 15, improper overtime charges. (Pl. Mem. Opp. Summ. J. & Supp. Cross-Summ. J. at 8-9.)

To prevail on a Title VII claim of a hostile work environment, plaintiff must demonstrate that the hostile work environment was created because of her race. *Brennan*, 192 F.3d at 318. By plaintiff's own admission, while working at Wyeth, the only time that she raised the issue of race in the harassment context was through her informal complaints regarding voodoo comments (Event 8). Plaintiff states that Bracco and Wardrop both made remarks indicating that she was involved in voodoo. However, plaintiff's contention that Bracco made such remarks is based solely on hearsay, not supported by an affiant with first-hand knowledge, and, therefore, not proper for this Court to consider. (Morelli Decl., Ex. A at 162); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (a hearsay statement is not competent evidence and, thus, not proper for a court to consider on a summary judgment motion). Thus, the Court considers only the voodoo comment alleged to have been made by Wardrop. At the outset, the Court notes that alleging the practice of voodoo may not necessarily be a racial epithet. Assuming, without deciding, that this allegation of practicing voodoo is a racial remark, this single, isolated comment is insufficient to sustain a claim of a hostile work environment because it was neither extraordinarily severe nor pervasive. *Cruz*, 202 F.3d at 570. Apart from the hearsay statements alleged to have been made by Bracco, plaintiff has made no allegation of any other racial comment during her almost thirty-year tenure at Wyeth. No reasonable jury could find that one comment over such a time period rises to the level of pervasive or extraordinarily severe. *Harris*, 510 U.S. at 21 (the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the

33

conditions of employment to implicate Title VII.") (internal quotation marks and citations omitted; alteration in original); *Schwapp*, 118 F.3d at 110 ("[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . there must be a steady barrage") (internal quotations marks and citations omitted); *Clerge v. Consol. Edison*, 1999 WL 239688, at *3 (S.D.N.Y. Apr. 23, 1999) (four racially "tinged" incidents not severe or pervasive enough to create a hostile work environment).

None of the other events that plaintiff alleges to have given rise to her hostile work environment claim actually support this claim.  It does not appear that any of those events, on their face, occurred because of her race and, even if they were racially motivated, they do not appear to have occurred in sufficient concert or with sufficient continuity to withstand a motion for summary judgment.  *Cruz*, 202 F.3d at 570.  Plaintiff admits that being assigned to work with pan coaters (Event 10) was part of her job description and, while she alleges that she was assigned to that area more than were white workers, she does not identify any white workers who were assigned to that area less frequently than she was.  Moreover, during her deposition, plaintiff admitted that "if it was [her] race, the color of [her] eyes, the sound of [her] voice, [she doesn't] know."  (Morelli Decl., Ex. A at 209-10.)

Plaintiff alleges that Dubler's improper supervision of her gave rise to a hostile work environment (Events 11-14).  This supervision includes allegations that Dubler observed her from behind a machine, requested to see the contents of her pockets and threatened her job due to her admitted paperwork errors.  Close monitoring and mild rudeness is typically "not so severe as to be abusive," particularly in a situation such as this, where there is no indication that the behavior was linked to plaintiff's race.  *Demoret v. Zegarelli*, 451 F.3d 140, 149-50 (2d Cir. 2006).  Dubler's

request to see the contents of plaintiff's pocket is undisputedly a request that occurs with some degree of regularity on the Wyeth production floor and plaintiff admits that she does not know whether Dubler made the same request of white workers.  Moreover, Dubler's threat to plaintiff's job was based on paperwork errors that plaintiff admitted to having made.  While plaintiff alleges that she heard from a white worker that he had made more paperwork errors than she had and was not threatened, this statement is inadmissible hearsay.  Based on the evidence presented, it seems clear that the job threat was based not on race, but on job mistakes that plaintiff admits that she made.

Plaintiff next alleges that two incidents regarding her overtime shifts (Events 6 and 7) gave rise to a hostile work environment.  In the first incident, plaintiff admits that Bracco accommodated her request to change her overtime shift.  She states that Sylvain, however, treated her unfairly by assigning her to a different train during that shift.  No competent evidence presented indicates that this assignment was made because of her race; rather, the entire shift change itself was instigated by a voluntary request made by plaintiff and, in granting that request, Bracco was accommodating her.  Plaintiff states that the second incident, in which Bracco refused her second shift-change request, was discriminatory; however, the record does not support this allegation.  It is undisputed that Sylvain and plaintiff argued during plaintiff's overtime shift the previous week and Bracco states that he was aware of this.  No evidence presented indicates that the argument was a pretext for Sylvain, an African American, to avoid working with plaintiff, also an African American.

Plaintiff also alleges that two arguments, one that she had with Sylvain (Event 4) and one that she had with Flowers, (Event 9) gave rise to a hostile work environment.  Plaintiff's argument with Sylvain occurred in May 2000 and was based on Sylvain's denial of an overtime shift that plaintiff

35

had expected to work.  Plaintiff admits that she cursed at Sylvain and, at the time, apologized to the department.  There is no indication that Sylvain, an African American, denied the shift based on plaintiff's race and, even if he did, this was an isolated incident.  Plaintiff's argument with Flowers occurred in September 2002.  During the argument, plaintiff and Flowers shouted at each other and plaintiff alleges that Flowers followed her around the room for forty-five minutes.  This is the only hostile work environment allegation that involves a possible physical threat.  However, it is also the only allegation involving Flowers; Flowers apologized after the incident and the evidence presented supports a finding that this was an isolated incident.

Finally, it is important to note that the acts that plaintiff claims gave rise to a hostile work environment are unconnected.  Each act occurred at a different time, involved a different supervisor, and occurred for a different reason.  No competent evidence presented to this Court supports a finding that the events are sufficiently related to support a finding of a hostile work environment.

Not only has plaintiff failed to meet her burden with respect to the hostile work environment claim, but the claim also fails because Wyeth has met its responsibility to provide plaintiff with a non-hostile work environment.  The Supreme Court has held that an employer is vicariously liable for an actionable Title VII hostile work environment created by supervisors with authority over the plaintiff.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  However, an employer may avoid liability in that situation, provided that no tangible employment action against plaintiff employee has occurred, by (1) exercising reasonable care to prevent and promptly correct the behavior; and (2) providing corrective opportunities to the plaintiff employee which he fails to take advantage of.  *Id*.

Plaintiff made one complaint of discrimination, which regarded Event 15, the improper overtime charges as marked by Torres.  Wardrop twice instructed Torres to correct those charges.[19] When Torres still did not correct the charges, Wardrop contacted the Labor Relations and Human Resources Departments, which immediately initiated an investigation.  Upon conclusion of that investigation, Torres was fired and plaintiff's improperly charged hours were corrected.  It is clear that Wyeth exercised reasonable care to promptly correct the behavior about which plaintiff complained.

Apart from plaintiff's complaint of the improper overtime charges, plaintiff never lodged a formal complaint of race discrimination and, with the exception of the voodoo incident (Event 8), plaintiff never even informally made such a complaint.  (Morelli Decl., Ex. A at 206-07.)

> Q.    Do you know whether any of your supervisors had any knowledge of you making any complaint of race discrimination during your time at Wyeth?
> A.    No, sir, because my complaints were as an employee, is how I made my complaints.
> Q.    So you never made complaints of race discrimination directly to your supervisors.
> A.    No, sir.

(*Id.*)  It is undisputed that Wyeth has extensive written policies against discrimination and plaintiff admits that she was aware of the formal grievance procedures in the union contract and that she understood that she had the right to complain to the Human Resources Department if she felt that she was being discriminated against.  (Pl. R. 56.1 Counterstmt. ¶ 16; McQuade Decl., Ex. 1 at 173.) Courts in this circuit have consistently held that a written policy prohibiting illegal harassment or discrimination is a significant factor in determining whether an employer has provided its employees with a reasonable avenue of complaint.  *See Fierro v. Saks Fifth Ave.*, 13 F. Supp. 2d 481, 491

---

[19]  While plaintiff contends that Torres told her that Wardrop never made such an instruction, that assertion is hearsay and, therefore, this Court will not consider it on a motion for summary judgment.

(S.D.N.Y. 1998), citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998); *see also Arroyo v. WestLB Admin., Inc.*, 54 F. Supp. 2d 224, 231 n.5 (S.D.N.Y. 1999), *aff'd*, 213 F.3d 625 (2d Cir. 2000).   Wyeth has clearly provided plaintiff with avenues of complaint, thereby exercising reasonable care in preventing harassment.   Plaintiff took advantage of those opportunities only once and makes no allegation that anybody at Wyeth attempted to dissuade her from lodging any formal complaint.   Given the undisputed facts, Wyeth has plainly exercised reasonable care to promptly address plaintiff's complaint regarding improper overtime charges and provided plaintiff with ample opportunity to make additional complaints, which she chose not to do.

No reasonable jury could find that the isolated incidents discussed above created a pervasively hostile work environment based on plaintiff's race.   Plaintiff's claim of hostile work environment is dismissed.

## VI.   <u>Constructive Discharge Claim</u>

The standard for constructive discharge is whether "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004).   Or, as the Second Circuit has stated, "[c]onstructive discharge occurs when an employer *deliberately* makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."   *Kader v. Paper Software, Inc.*, 111 F.3d 337, 339 (2d Cir. 1997) (internal quotation marks and citations omitted; emphasis in original).   A constructive discharge claim may be viewed as an "aggravated case of hostile work environment."   *Ferraro v. Kellwood Co.*, 2004 WL 2646619, at *7 (S.D.N.Y. Nov. 18, 2004).

Plaintiff's claim for constructive discharge must be dismissed because it relies on a failed hostile work environment claim. *Nakis v. Potter*, 422 F. Supp. 2d 398, 412 (S.D.N.Y. 2006) ("after *Suders*, without an actionable hostile environment claim, [a] plaintiff's constructive discharge claim must also fail.") (internal quotation marks and citations omitted). Yet even without reference to the hostile work environment claim, plaintiff's constructive discharge claim must fail.

Based on plaintiff's own admissions, she did not believe that anybody at Wyeth was intentionally trying to force her out at the time she accepted the severance package. (Morelli Decl., Ex. A at 254.) Rather, stated plaintiff, "[she] was just tired." (*Id*.) Plaintiff admits that she voluntarily accepted the severance package, that she was not coerced into accepting that package and that she left Wyeth voluntarily at that time. (*Id*. at 258.) Plaintiff also concedes that, at the time she signed the agreement, she did not believe that anybody at Wyeth was retaliating against her because of her complaint of race discrimination, nor did she believe that she was being discriminated against based on her race. (*Id*. at 259-60.)

Moreover, the circumstances surrounding plaintiff's discharge do not indicate that Wyeth intended to force plaintiff out of her position. Plaintiff signed the acknowledgment of the "Voluntary Termination and Transition Benefits Package" on August 17, 2005. (McQuade Decl., Ex. 24.) Yet plaintiff remained an employee of Wyeth until October 7, 2005, in part due to plaintiff's request to delay her termination until her fifty-fifth birthday. (*Id*., Ex. 1 at 267-70; Defs. R. 56.1 Stmt. ¶ 133.) Far from forcing plaintiff out of her position, Wyeth retained her as an employee for almost six weeks after she signed the acknowledgment and a portion of that time represented an accommodation to her. *See Baptiste v. Cushman & Wakefield*, 2007 WL 747796, at *12 (S.D.N.Y. Mar. 7, 2007) ("It cannot be said that [p]laintiff was forced involuntarily to resign when the

undisputed facts demonstrate [that] she chose the date and time to do so.").

Finally, courts in this circuit have held that the availability of alternative avenues to resignation, such as complaint procedures, may preclude a finding of constructive discharge. *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1157 (2d Cir. 1993); *see also Silverman v. City of New York*, 216 F. Supp. 2d 108, 115 (E.D.N.Y. 2002) ("[C]ourts in this circuit generally have refused to find a constructive discharge where an employee had an avenue through which he could seek redress for the allegedly intolerable work atmosphere . . . but failed to take advantage thereof.") (internal quotation marks omitted).  In plaintiff's affidavit, she states that she accepted the severance package because she was tired and "no longer had the energy to complain."  (Early Aff. ¶ 60.)  Plaintiff's decision to pursue voluntary termination rather than to pursue alternative avenues, such as Wyeth's formal grievance procedures, precludes a finding that plaintiff's only choice was to resign.

Given plaintiff's candid admissions and in consideration of the evidence proffered, viewed in the light most favorable to her, no reasonable jury could find that Wyeth intentionally forced plaintiff into an involuntary resignation.  Therefore, plaintiff's claim of constructive discharge is dismissed.

## VII.   Claims Against Individual Defendants Bracco and Wardrop

Plaintiff claims that Bracco and Wardrop "aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of N.Y. Exec. Law § 296(6)."  (Complt. ¶ 54.)  Defendants move for summary judgment as to the claims against Bracco and Wardrop.  The Court notes that plaintiff has not responded to defendants' arguments in favor of summary judgment as to these claims.  (*See* Pl. Mem. Law Opp. Summ. J. & Supp. Cross-Summ. J.)

Plaintiff's claims against Bracco and Wardop must fail because they rely on the failed claims against Wyeth. Yet even without reference to the failed claims against Wyeth, plaintiff's aiding and abetting claims against Wardrop and Bracco must still fail.

Plaintiff states that her "basis for believing that Bracco discriminated against [her] was because he told [her] co-workers that [she] was performing voodoo of sorts." (Early Aff. ¶ 67.) Plaintiff admits that she herself "absolutely" never heard Bracco make those statements. (Morelli Decl., Ex. A at 162.) Plaintiff's allegation is thus based on inadmissible hearsay, which is not proper for this Court to consider on a summary judgment motion. *Sarno*, 183 F.3d at 160, quoting FED. R. CIV. P. 56(e) ("an affidavit submitted in opposition to summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein") (internal quotation marks omitted). Therefore, this Court will not consider this evidence.

Plaintiff also states that "all these writeups" were done through Bracco and that the writeups were discriminatory. (Morelli Decl, Ex. A at 247.) As discussed above, plaintiff has not set forth an actionable accusation of disparate treatment based on any writeup because the conduct alleged occurred outside of the statute of limitations period or because she has not suffered any adverse employment action as a result of any writeup within the statutory period. Moreover, plaintiff admits Bracco himself never issued a writeup and that she has no first-hand knowledge that Bracco directed any other supervisor to issue a writeup. (*Id*. at 129.) According to plaintiff, the voodoo comments and the writeups are the only two ways in which Bracco discriminated against her. (*Id*.)

Plaintiff states that her only basis for believing that Wardrop discriminated against her is his alleged comment, "[a]re you home sticking pins in a doll[?]" (*Id*. at 244-45.) Courts in this circuit

41

have held that stray remarks "without more," even when made by a decisionmaker, "do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *see also Muse v. N.Y. City Dep't of Hous. Pres. & Dev.*, 2000 WL 1209427, at *4 (E.D.N.Y. Aug. 22, 2000) (an "isolated and stray remark [is] insufficient, without more, to raise an inference of discrimination and defeat summary judgment"). Thus, in a stray remark context, the key is whether the remark was accompanied by "more." Because plaintiff herself admits that her claim against Wardrop is based solely on one comment, it alone is insufficient evidence of discrimination to withstand a motion for summary judgment. Plaintiff states that she does not believe that Wardrop retaliated against her in any way. (Morelli Decl., Ex. A at 245.)

Given plaintiff's candid admissions in her own sworn statements, plaintiff cannot meet her burden of proof that Bracco or Wardrop engaged in any action that either aided or abetted Wyeth in violating her rights. Plaintiff's individual claims against Wardrop and Bracco are therefore dismissed.


## VIII.   Defendants' Counterclaims

Plaintiff moves for summary judgment dismissing defendants' counterclaims of fraud in the inducement and unjust enrichment. Because the Court has dismissed plaintiff's claims in their entirety, we consider defendants' counterclaims to be moot.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. #12) is granted in its entirety.  Plaintiff's cross motion for summary judgment is denied as moot.  The action is dismissed with prejudice and without costs or attorneys' fees.  The Clerk of the Court is directed to enter judgment in favor of defendants.

SO ORDERED.

Dated: White Plains, New York
       February 25, 2009

*William E. Conner*
Sr. United States District Judge